606 A.2d 225

Michael WHITTLESEY

v.

STATE of Maryland.

No. 78 Sept. Term, 1991.

Court of Appeals of Maryland.

May 13, 1992.

Eldridge, J., filed opinion concurring in part and dissenting in part.

Robert M. Bell, J., filed dissenting opinion which Chasanow, J., joined.

**504**

Thelma J. Thompson, Acting Deputy Dist. Public Defender, Towson and George E. Burns, Jr., Asst. Public Defender, argued and on brief (Stephen E. Harris, Public Defender, Baltimore, on brief), for appellant; and Michael Whittlesey, pro se.

Gary E. Bair, Asst. Atty. Gen., argued and on brief (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

■ On this appeal, the sole question presented is whether the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States prohibits the prosecution of Michael Whittlesey for the murder of James Rowan Griffin, known as Jamie.[1]

---

1. The Fifth Amendment to the Constitution of the United States designates a variety of rights to which an accused is entitled in criminal proceedings. Among those rights is a prohibition against double jeopardy set out in this language:

> [N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb....

## I.

The double jeopardy issue stemmed from Jamie's disappearance on 2 April 1982. He was missing for eight years. On 24 March 1990 his remains were discovered, buried in Gunpowder State Park, Baltimore County, Maryland.

Jamie's disappearance and the discovery of his remains led to the return of two indictments. The first indictment, hereinafter referred to as "the robbery indictment," was filed in the Circuit Court for Baltimore County on 6 July 1982. It alleged in five counts that one Michael Whittlesey committed two offenses against the person of Jamie: (1) common law robbery, and (2) assault with the intent to rob; two offenses of theft of Jamie's property: (1) a cassette tapeplayer, and (2) 17 tape recordings of various artists; and an offense of theft of a silver colored 1975 Ford Granada automobile belonging to Jamie's father, Norville Griffin. Each of the crimes was alleged to have been committed on 2 April 1982. On 16 February 1984 a jury in the Circuit Court for Baltimore County found Whittlesey guilty of all the offenses charged. Upon appropriate mergers of the convictions, the court sentenced Whittlesey to imprisonment for a total of 25 years. The judgments were affirmed by the Court of Special Appeals. *Whittlesey v. State*, filed 30 January 1985, unreported, *cert. denied*, 303 Md. 297, 493 A.2d 350 (1985).[2]

---

The Clause is enforceable in state criminal proceedings through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

The Maryland Constitution does not contain a provision prohibiting double jeopardy, but the right is recognized in the common law of this State. *Middleton v. State*, 318 Md. 749, 756, 569 A.2d 1276 (1990); *Pugh v. State*, 271 Md. 701, 704, 319 A.2d 542 (1974). "Of course," we stated in *Thomas v. State*, 277 Md. 257, 267, n. 5, 353 A.2d 240 (1976) "since *Benton* ... the Supreme Court decisions are controlling in cases presenting double jeopardy issues."

**2.** Whittlesey filed a petition for relief under post conviction procedures. The matter was removed for hearing to the Circuit Court for Harford County but Whittlesey withdrew the petition before resolution by that court.

The second indictment, hereinafter referred to as "the murder indictment," was filed in the Circuit Court for Baltimore County on 23 April 1990. It charged Whittlesey with the premeditated murder of Jamie on 2 April 1982. The State gave notice that it intended to seek a sentence of death if Whittlesey was found guilty of murder in the first degree. Whittlesey suggested that the cause be removed to another jurisdiction for trial, and it was transferred to the Circuit Court for Caroline County. Whittlesey filed a motion to dismiss the indictment. Upon a plenary hearing, the motion was denied. Whittlesey appealed from that judgment. On our own motion, before the appeal was heard and decided by the Court of Special Appeals, we ordered that a writ of certiorari issue to that court.

## II.

The saga of Jamie's fate was told at the hearing on the motion to dismiss. We glean the transcript of the proceedings at that hearing.

## A.

Among the exhibits at the hearing on the motion to dismiss was the transcript of the trial of the robbery indictment. The transcript reflects the events leading to the return of that indictment. We summarize the testimonial and tangible evidence adduced at the trial.

Jamie was the son of Norville and Louella Griffin. At the time of his disappearance he was five feet four inches tall, weighed 95 pounds and was distinguished by red hair. He suffered from asthma for which he took medication. On 2 April 1982 he left his home for school about 7:40 a.m., driving his father's silver colored 1975 Ford Granada. He had permission to drive the car to school because of his asthmatic condition. He was dressed in blue jeans, a red shirt, a black light-weight jacket and blue and white tennis shoes. He took with him his tape recorder, a number of tapes and his wallet containing a sum of money. He was to

return home by 4:00 p.m. so his father could drive him back to his school to meet a bus which would take a group of students to Dulaney School to attend a meeting of "Young Life" a "Christian Organization." Jamie had not returned by 4:30 p.m. His parents were concerned. "Jamie has never been this late without calling and letting us know." Mr. Griffin asked his wife to call the police. He went to Dulaney School to find his son.

Michael Whittlesey came into the picture early on. He was Jamie's friend and "spent a lot of weekends" at the Griffin home. Jamie was not at the school, but Mr. Griffin received information indicating that his son and Whittlesey were seen together in the Griffin automobile and planned to go to the Joppatowne Shopping Center. Mr. Griffin went to Joppatowne but did not find either Jamie or Whittlesey.

About 2:45 p.m. on 2 April 1982, Whittlesey's girl friend saw him and Jamie at the Joppatowne Shopping Center. According to her, they told her that they were going to Washington, D.C. and would return about 10:00 p.m. She saw them enter a car, Jamie driving and Whittlesey in the rear seat. In reply to her question why Whittlesey was sitting in the back, he replied that his legs were too long. Due to Jamie's stature, he could only drive the car with the front seat as far forward as it would go, "all the way up to the steering wheel," and even then had to have a thick pad at his back.

Mr. Griffin did not get home from his search for Jamie until about 10:00 a.m. the next day. When he arrived home he went to the Cockeysville Police Station in response to a call that Whittlesey was there. He met Whittlesey outside the station. Whittlesey told Mr. Griffin that he and Jamie had gone to Washington in the car, accompanied by two friends in a van. He and Jamie spent the night in Washington in the car and the two friends slept in the van. When Whittlesey awoke the next morning, Jamie was gone. He left a note that he and the other two persons had gone to get something to eat and directed Whittlesey to drive the car to Golden Ring Mall. Whittlesey went to the mall and

found the van but not Jamie or his other friends. He went into the mall to look for them but did not find them, and when he came out the van and the car were gone. When Mr. Griffin questioned this story, Whittlesey assured him that "there's nothing wrong with Jamie. Jamie is fine."

Whittlesey contacted the police on his own initiative and, it appeared that, at first, he gave them the same accounting of his activities with Jamie as he gave Mr. Griffin. He also volunteered a similar story to several other persons but, at times, with significant variations. When his girl friend talked to him on the phone two days after she saw him at the shopping center, he told her that Jamie "had dropped him off" the day before at Golden Ring Mall. He was interviewed several more times by the police, and there were discrepancies in his statements as to what took place in Washington and how he came back to Maryland. In any event, there soon appeared good reason to believe that the alleged trip to Washington was no more than a figment of Whittlesey's imagination. Whittlesey had arranged to visit his father, who lived in Reisterstown, Maryland, on the night of 2 April 1982. About 7:00 p.m. the father accepted a collect call from his son, which, at the time, the father understood from Whittlesey, was being made from Washington, D.C. The father's telephone bill, however, established that, in fact, the call emanated in Atlantic City, New Jersey.

On 21 May 1982 an officer of the Atlantic City Police Department saw an automobile with a Maryland license parked on South Texas Avenue in Atlantic City near the Playboy Club, which Whittlesey had frequented in the past. The car was in the vicinity of the phone booth from which the call to Whittlesey's father had been made. The vehicle was towed to the police tow lot and subsequently released to the Baltimore County Police Department. It proved to be the Griffin automobile. When Mr. Griffin saw his automobile after it was recovered he noted that it had been driven some four or six thousand miles more than when he last saw it. The trunk lock was smashed out and the thick

pad that Jamie used when driving the car was in the trunk. It also had a dent in the right front fender which had not been there.

David Strathy was a friend of Whittlesey. They shared a common interest in playing pool and drinking beer. On the night of 10 April 1982 they were pursuing their interests. Whittlesey asked Strathy if he "wanted to go dig up some gold and silver." They fetched a shovel from Whittlesey's home and drove in Strathy's car to Gunpowder State Park behind Golden Forty off Route 7 near the Baltimore County–Harford County line. When the car was parked, Whittlesey informed Strathy that there was no gold or silver but he wanted Strathy to help him bury a body. Whittlesey led Strathy to a wooded area on the Baltimore County side, and after getting his bearings, stopped at a little mound covered with pine needles. He said, "Look this could be a foot." He wiped away some of the pine needles disclosing a tennis shoe. Strathy took the shovel and scraped away more of the pine needles to check if there really was a body. He uncovered a red shirt and a jacket. At that point, before actually seeing a body, Strathy said that he was getting out of there. He took Whittlesey home forthwith.

Strathy talked to Whittlesey a few days later. Whittlesey offered Strathy $40 to help bury "the body." Strathy told Whittlesey that he "didn't want to have nothing to do with him, not to bother me anymore." Strathy saw a missing person poster concerning a James Griffin. The description on the poster "kind of made [Strathy] decide that it probably was a body back there and [that he] had better call the police." Without giving his name, he told the police that "there was a body in this wooded area."

Whittlesey discussed the matter several times with Strathy at school. On one occasion Whittlesey told Strathy that he was getting scared and was going to leave town. Another time he warned Strathy "not to talk to the police or tell anybody about it, and keep it a secret." The police investigation brought Strathy to their attention, and they interviewed him on 1 June 1982. He "just told the police what I

knew because my conscience was bothering me—talking to the police was the right thing to do." Following the interview, he accompanied the police to Gunpowder State Park, but a body was not located.

Strathy agreed to be outfitted with a "body-wire"—a recording device—in order that his conversations with Whittlesey could be surreptitiously taped. He arranged to meet with Whittlesey and recordings of their conversations were made on June 2nd, 3rd and 4th. The relevant parts of the conversations were winnowed from the tapes and we summarize them.

There were frequent comments by Whittlesey relating to Jamie. He noted that "nobody even knows anything yet." He stated, "you know what I do to hustlers, Dave," and when Strathy asked what he did, replied, "You know where that little kid with the red hair is." As they were riding by Gunpowder State Park, Strathy told Whittlesey to be quiet. "Be solemn when you pass the gravesite of—." Whittlesey interjected, "Jamie Griffin." Strathy asked if that was a nickname, and Whittlesey answered, "Yeah. Dave we're not to remember the kid, ever."

Strathy wondered if he could be alive. Whittlesey replied, "[H]e's dead." Whittlesey told Strathy that he thought Jamie bled to death from an injury to his head, suffered when he ran into a tree. Whittlesey claimed that Jamie was taking dope—little purple things. Whittlesey had been told that Jamie had a lot of money on him and thought that he could punch Jamie in the face and grab his money. Whittlesey was laughing and Jamie was running around "goin' ... I can fly, I can fly." Whittlesey said, "He runs full speed into a tree head on. It's unbelievable. Unbelievable." Whittlesey described what happened then:

[He] spent like fifteen minutes like walking around dead, going 'oh Mike, Mike, get helpful, get helpful,' and I'm there laughing 'cause I'm waitin' for him to die. He says Mike, run, and I'm waitin' for him. He's bleedin' all over the place, squirting out.... I just sit back and watch him struggle.... He fell down. I said time to take the

money and run. So I put my hand in his back pocket, and the body, the whole body moves.

Whittlesey did not try to wake Jamie up. "I knew he was dead. I knew he was dead. Blood was coming out of his mouth, too." Whittlesey said that he should have left without the money, but he went into Jamie's back pocket for his wallet and found the keys to the Griffin car. When the body moved Whittlesey ran. He left the scene in the car.

Whittlesey revealed that after visiting the scene with Strathy, he went back and buried the body "way down deep, man. I dug for hours, man.... I could stand in that [hole] and still not see the ground. That's deep. That's way down." He placed the body in the hole by inching it into a duffel bag by means of a stick. He did not want to touch it because of the stench and the blood. He filled up the hole and patted down the grave. He covered "it all with green grass, like, these little green things and these little brown particles. And then I put some sticks and then it was all clear, you know, like everything all nice." But there was excess dirt. "[W]hen you cover the body up, you waste all that dirt, because the body takes up dirt space." Afraid that someone would see the fresh dirt, Whittlesey used his shirt to transport it to a stream and flush it away. It took him hours. Whittlesey complained that he "had to recover that dirt like five times 'cause I didn't want anyone to see that blood and get suspicious then they dig up the whole place." He said, "it's only a long shot, but it could happen." Whittlesey observed that he was "smart" to use a duffel bag. "If I was dragging a body would've left a blood trail." He accepted Strathy's congratulations:

Thank you. Thank you. Go back seven years from now, the bones'll be all you going to dig up, just the bones in the knapsack bag.

Strathy expressed concern that his fingerprints were on the shovel. Whittlesey told him not to worry about it. "I throwed it so far away. I put it in a dumpster.... Bent it

all out of shape so the garbage men, they'll think it's just a shovel."

Whittlesey drove the car to Atlantic City, gambled, won about $300, spent most of money, left the car, and went home on a bus. Before he abandoned the car, he put "a couple dents in it," by striking some car in an attempt to park. When he returned to Atlantic City "like two weeks ago," the car was still where he left it. He wondered how he was going to explain his fingerprints on the car.

On the last day of the taping Strathy suggested that to arrest Whittlesey "you gotta have a weapon," and asked if there was a weapon. Whittlesey said, "No." Strathy said:

He ran into a tree. If they dig it up and all the kid did was run into a tree, they can prove that with the head wound.

What follows is garbled. It is clear, however, that Whittlesey said twice, "I mighta pushed him." Asked why he "pushed the kid," in light of a prior statement by Whittlesey that Jamie had no money, Whittlesey said:

I found out he did. $750 money order. Why the kid had a money order I don't know. I found that out later. I didn't know.

(Obscenities in all of the above quotations are deleted.) Whittlesey's attitude toward Jamie is illustrated by this statement to Strathy:

I really didn't like the kid, anyhow.... [H]e always tried to cheat me out of nickels and dimes....

The police obtained a warrant to search Whittlesey's home. Whittlesey was present at its execution. A tape recorder and a number of tapes, which Whittlesey said belonged to Jamie, were recovered in Whittlesey's bedroom. They were admitted in evidence at the trial upon testimony that they were the property of Jamie, had been in his possession on 2 April 1982 and were in Whittlesey's possession the next day. When a friend saw Whittlesey in the possession of the recorder and tapes on 3 April, Whittlesey explained that he had been playing pool and won. The loser

did not have enough money to pay the bet on the game, and paid him off by giving him the recorder and tapes.

At the trial of the robbery indictment, the State rested on the evidence we have recounted. No evidence was offered on behalf of Whittlesey. The jury verdicts followed.

### B.

The evidence adduced at the hearing on the motion to dismiss reveals the background of the murder indictment. The transcripts of the trial on the robbery indictment and the sentencing proceedings, the State's notice that it was seeking the death penalty, the tapes of the conversations between Whittlesey and Strathy, and transcriptions of excerpts from those tapes were received in evidence at the hearing at the instance of defense counsel. At the time Strathy was interviewed by the police on June 1st and 2nd 1982, he made a statement which was reduced to writing and signed by him. This statement was not offered at the trial of the robbery indictment, but was received in evidence at the hearing on the motion to dismiss. It disclosed that Whittlesey gave a version of Jamie's disappearance which was not in accord with the one he gave at the time of the taped conversation with Strathy. In the written statement Strathy said that Whittlesey told him that

> this kid supposedly had $800.00 in his pocket. When we were sitting in the car he started telling me about the kid being real little, that his [Whittlesey's] brother had gotten into a fight with this kid because he caught him cheating at cards, that there were two ace of spades played at the same time during the game. He also told me that the kid had red hair. I asked him his name and he said I didn't know him because he wasn't from around here. He said his brother hit him and he hit his head against a tree and he wasn't breathing. Mike said the kid was suppose to have $800.00 in his pocket and when we were at the body Mike asked me to reach into the pants pocket to get the money to see if it was there. Mike said if it was there then his brother had killed him accidently and if it wasn't

he had killed him just to take the money. Mike also said that his brother had taken this kid's car and drove it to Florida and got stopped for a traffic violation and they found out the car was stolen or something and that the kid was missing so they were holding his brother; so he wanted to get rid of the body so they couldn't do anything to his brother. He didn't say where in Florida.

At the hearing on the motion to dismiss, the State produced Detective Charles Edward Naylor, who had served some 21 years as a member of the Baltimore County Police Department, the last seven years in the Homicide Unit. He had been involved in the investigation of Jamie's disappearance since the youth was reported missing. Naylor first told of the efforts to locate Jamie to the time Whittlesey was arrested on 6 June 1982. His narration followed closely the evidence presented at the trial. He brought out, however, that the police responded immediately to the report that Jamie was missing. "That evening a search was conducted by numerous interviews and phone calls to Jamie's friends, teachers, schoolmates in attempting to locate his whereabouts...." Up to the time Strathy was equipped with a recording device, some 30 persons had been contacted. Naylor further disclosed that attempts by the police to track down the two persons who, according to Whittlesey, had been with him and Jamie in Washington, D.C., were unsuccessful. Naylor brought out that when the Griffin car was found, Baltimore County detectives joined with officers of the Atlantic City Police Department to try to locate Jamie in the boardwalk area of that city. Naylor also observed that no indicia of foul play were found in the Griffin car—"like blood or anything like that...." The information in the hands of the police resulted in the decision to arrest Whittlesey, and this was accomplished on 6 June 1982.

The investigation of the disappearance of Jamie intensified. At 8:00 a.m. on 6 June 1982, prompted by the information obtained by the electronic surveillance of Whittlesey, and despite an unsuccessful prior search based upon

the information received from Strathy, the police began a search of the 23½ acres of Gunpowder State Park. The search continued until about 6:30 p.m., but no trace of a body was found. Efforts to find the body were conducted from about 8:00 a.m. to 6:30 p.m. on 20 days thereafter until 29 June. On eight days the number of men involved varied between 43 and 50, on five days between 20 and 25, and on four days between 16 and 18. Only on the last four days of the search did the detail consist of less than 16 men, 7 on 24 June, 9 on 25 June, and 8 on each of 28 and 29 June. The searches were not haphazard. The police contacted the Federal Bureau of Investigation requesting information as to methods of searching for a buried body. The Bureau suggested the use of a steel rod about six and a half feet long, bent on one end. It was to be inserted in the ground, withdrawn and smelled for the odor of decomposing flesh.

The method was to stand side by side, shoulder to shoulder and in straight lines in marked off areas to insert the rods into the ground and extract them, check them for the odor and then move approximately six to ten—twelve inches in a direction, insert the rod. Do this and repeat this over and over and over again until you were finished one particular area.

Naylor said that this method was employed in all suitable parts of the tract. Most of the twenty-three and a half acres consisted of "heavily treed forest area with some open areas," but the procedure was followed in all open areas and between trees. Also bulldozers, backhoes and grading equipment were used to remove underbrush and small trees so the area could be searched. Spots that looked like they had been subjected to recent digging were excavated. Methane gas meters were utilized. The meter would show the presence of methane gas from a decomposing body. Upon such indication the area was dug up. Despite these heroic efforts, a body was not discovered. The result of the failure to find a body to substantiate that Jamie was actually dead, resulted in the considered decision by the prosecuting authorities to seek, at the moment, an

indictment against Whittlesey only for robbery and theft. Obviously the Grand Jury was in accord. As we have seen, the true bill it returned presented only those crimes.

The police did not close their file upon the convictions of Whittlesey under the robbery indictment. Officially and unofficially, the investigation continued. Nor were Jamie's parents content. Naylor related that several times between 29 June 1982 and the time the body was discovered, the Gunpowder State Park and its environs were searched. In May of 1985 the police received information which raised the possibility that a body had been placed in a private pond in Harford County near the park. Although the pond had been previously drained by an officer acting on his own in an attempt to find Jamie's body, officers of the Baltimore County and Harford County police departments again drained the pond and dug up the bottom, but to no avail. Also several times in 1985 Naylor and a fellow detective, on their own time, accompanied Jamie's father to the area to which Whittlesey had taken Strathy, in an attempt to locate any evidence pertaining to Jamie's disappearance. Near the end of July 1985 the police were referred to a certain area by Whittlesey's cell mate with whom Whittlesey had discussed the matter. The area was searched by means of "an advanced metal detector." The United States Army supplied the equipment and an expert technician to operate it. The detector pointed to 10 locations of buried objects. They were excavated but nothing significant was found. In the summer of 1986 another pond in the vicinity of the park was drained and the bottom probed for three and a half days with negative results.

Between 1984 and 1990 the police were contacted by psychics who claimed that their powers established that the body was buried in a certain area. The police checked out at least four of the areas but no body was found.

There was extensive publicity concerning Jamie's disappearance and the searches in the Gunpowder State Park. Persons in the neighborhood would call the news media whenever the area was searched and media personnel would

appear on the scene. Reward flyers were widely distributed. The reward offer for information leading to Jamie's whereabouts was at first $1,000 but was raised from time to time to reach a total of $10,000. There was a nationwide lookout through The National Criminal Information Computer for Missing and Exploited Children and the Missing Persons Children Network which resulted in numerous alleged sightings of Jamie. The police checked out leads in Maryland, Virginia, Ohio, Texas, Florida, West Virginia and British Columbia, Canada, for example. All the investigations were negative. Remains of a male body found near Aberdeen Proving Ground in Harford County and a body found in South Dakota answering the description of Jamie were investigated and found not to be Jamie. An inmate of the institution in which Whittlesey was incarcerated informed the police that Whittlesey told him that he and Jamie had robbed banks in New Jersey and Delaware. The police determined that there were no bank robberies in those states or in Pennsylvania by persons answering the description of either Whittlesey or Jamie.

There came a time prior to the discovery of the body when the police met with members of the Baltimore County State's Attorney's Office seeking an indictment charging Whittlesey with the murder of Jamie. The record before us does not disclose whether at that time the State's Attorney presented the matter to the Grand Jury, but in any event, an indictment was not returned. On 27 October 1988, however, the matter of a murder indictment was taken before the Grand Jury through the efforts of Jamie's parents. The consideration by the Grand Jury was apparently orchestrated by an attorney employed by the Griffins. An Assistant State's Attorney, a detective of the Baltimore County Police Department, who was one of the original investigating officers, Strathy, and other witnesses, not disclosed by the record here, appeared before the Grand Jury. We do not know what the jurors were told nor are we privy to their deliberations, but an indictment was not returned.

The enigma of Jamie's disappearance was finally solved on 24 March 1990. Jamie's remains were found through the undying persistence of the Griffins, the wholehearted cooperation of the police and the volunteered assistance of private corporations.

In the early part of 1989 Mr. Griffin brought to the attention of the police a new ground surface radar instrument which could be used to search out gravesites and buried bodies. The police learned that the Federal Bureau of Investigation had the equipment and sought its assistance. The Bureau sent three of their experts to the park area. The experts opined that "the geography there was not conducive to the use of their particular equipment." In short, they told the police that they would not conduct the search. Mr. Griffin, on his own, wrote a number of companies which used the equipment. After months of correspondence, several companies volunteered to provide their time, equipment and personnel to search the Gunpowder State Park area. Four teams of experts and four radar detector units arrived on the scene. Accompanied by police officers, the teams were assigned to search not only the area pinpointed by Strathy but areas nearby to which the body may have been removed for burial. To prepare for the use of the device, the area to be searched was divided into grids designated by rope lines. The detecting machine is a radar gun which is dragged on the ground in a straight line marked within the grid. Naylor explained:

> As the box is moved flat across the ground it sends a radar into the ground and actually picks up any kind of a surface or density.... in other words if the ground were dug at one particular time that would show it, that would show a disturbance in the ground below the surface.

Of course, to use the device the ground must be first cleared.

> What they do is they drag this thing across the ground, come back ... move a foot, drag it across the ground, come back ... and move a foot, drag it across the ground come back....

The police decided to concentrate on the area first designated by Strathy. A base was established in that area and a tent erected to protect the equipment from the inclement weather. A test run was made just outside the tent and a reading was obtained which the expert operator said was "exactly the kind of thing we are looking for." The spot was marked. They proceeded to run the equipment down the grid about 100 feet, and obtained about 10 other readings showing that the ground had been disturbed. The spots were marked. Inasmuch as the teams were available for only two days, the plan was to get as many readings as possible and at a later time the police would dig up the places marked. During the luncheon break, however, a police recruit in the training academy, assigned to assist in the search, decided to dig up the very first spot marked, just outside the tent. He uncovered a red shirt and human bones. A forensic odontologist identified the skeletal remains as those of Jamie. Jamie had at long last been found. The Medical Examiner reported that the manner of death was homicide.[3] The murder indictment promptly followed.

### III.

Our determination whether the judge below erred in denying Whittlesey's motion to dismiss the murder indictment begins with a consideration of what that indictment encompassed. It presented that Whittlesey

> feloniously, willfully and of deliberately premeditated malice aforethought did kill and murder one James Rowan Griffin. . . .

We discussed the crime of murder in *Hook v. State*, 315 Md. 25, 27–28, 553 A.2d 233 (1989) (footnotes omitted):

---

**3.** At the hearing on the motion to dismiss the indictment the hearing judge refused to admit the autopsy report which showed both the manner of death and the cause of death. It was stipulated, however, that the autopsy report stated that the manner of death was homicide and that there existed no expert medical opinion as to the manner of death prior to the discovery of the remains.

Homicide is the killing of a human being by a human being. It is culpable when it is felonious. It is felonious when it is not legally justifiable or excusable. Felonious homicide is either murder or manslaughter. Murder is in the first degree or in the second degree. In Maryland, all murder perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing or committed in the perpetration of, or attempt to perpetrate certain felonies (of which robbery is one) is murder in the first degree. All other kinds of murder are murder in the second degree.

The Maryland statutes designating murder in the first degree and murder in the second degree do not create new crimes but rather divide the common law crime of murder into degrees for the purpose of punishment. *Bruce v. State*, 317 Md. 642, 645, 566 A.2d 103 (1989). On the other hand, we pointed out in *State v. Ward*, 284 Md. 189, 195, 396 A.2d 1041 (1978):

In Maryland, murder and manslaughter are not considered as degrees of felonious homicide, but are regarded as distinct offenses, distinguished by the presence of malice aforethought in murder and the absence of malice in manslaughter.

*See Hook v. State*, 315 Md. at 28, n. 2, 553 A.2d 233; *State v. Faulkner*, 301 Md. 482, 485, 483 A.2d 759 (1984).

■ Under the murder indictment, Whittlesey could be convicted of murder in the first degree or murder in the second degree or manslaughter. Two of the instances in which he could be convicted of murder in the first degree are upon a determination by the trier of fact that the homicide (1) was wilful, deliberate and premeditated [4] or (2) was committed in the perpetration of a felony (felony murder). In felony murder an intent to kill is not a necessary

---

**4.** For the meaning of wilful, deliberate and premeditated *see Wilson v. State*, 261 Md. 551, 564–565, 276 A.2d 214 (1971), quoting *Hyde v. State*, 228 Md. 209, 215–216, 179 A.2d 421 (1962). *See also Ferrell v. State*, 304 Md. 679, 687, 500 A.2d 1050 (1985).

element. *Veney v. State,* 251 Md. 159, 174, 246 A.2d 608 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969).

> To secure a conviction for first degree murder under the felony murder doctrine, the State is required to prove a specific intent to commit the underlying felony and that death occurred in the perpetration or attempt to perpetrate the felony; it is not necessary to prove a specific intent to kill or to demonstrate the existence of wilfulness, deliberation, or premeditation.

*Bruce v. State,* 317 Md. at 645, 566 A.2d 103, and cases therein cited. As we said in *Jackson v. State,* 286 Md. 430, 435, 408 A.2d 711 (1979):

> [H]omicide arising in the perpetration of, or in the attempt to perpetrate, a felony is murder whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to supply the element of malice.

It is patent that there can be no felony murder when there has been no death. "[A]bsent death the applicability of the felony murder rule is never triggered." *Bruce v. State,* 317 Md. at 647, 566 A.2d 103, quoting *Head v. State,* 443 N.E.2d 44, 50 (Ind.1982).

### IV.

The facts pertinent to this appeal, as adduced at the hearing on the motion to dismiss, are not disputed, refuted or contradicted. So, we exercise our function to make an independent constitutional appraisal of the propriety of the denial of the motion to dismiss by applying the relevant law to the given facts. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990) and cases cited therein.

### A.

■ The challenge to the murder indictment relies only on the Double Jeopardy Clause of the Fifth Amendment. This was so below in seeking the dismissal of the indict-

ment, and it is so before us. In this Court, defense counsel's brief and oral argument and Whittlesey's "pro-se supplemental brief" look only to that clause. No other constitutional or common law impediment is suggested. Therefore, we call upon the decisions of the Supreme Court to determine how it has construed the Fifth Amendment Clause. *See* note 1, *supra.* The clause appears to be clear on its face, but often has proved to be most troublesome in application, particularly because of uncertainty as to what comprises "the same offence."

Four score years ago, in *Gavieres v. United States,* 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911), the Supreme Court established a test to determine whether a prosecution in a criminal cause offended the Double Jeopardy Clause of the Fifth Amendment. The Court, applying the test in the often-cited *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), stated that

> [t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

It explained the test, commonly known as "the *Blockburger* test," in the language of *Morey v. Commonwealth,* 108 Mass. 433 (1871):

> "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

*Blockburger* 284 U.S. at 304, 52 S.Ct. at 182. Conversely, the Clause

> prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes whenever each statute does not "requir[e] proof of a fact which the other does not."

*Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548 (1990).

After living with the *Blockburger* test for over half a century, the Supreme Court demonstrated that it had become concerned with the narrowness of the reach of what it had called in *Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977), the "established test." In *Corbin,* 110 S.Ct. 2084, the Court went beyond *Blockburger's* emphasis on the elements of the crime. We make no attempt to pinpoint the holdings of *Corbin. Cf. United States v. Felix,* —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1991). For the purpose of decision in this case, we assume that the application of the test announced in *Corbin* bars the prosecution of Whittlesey for murder. The Court, however, recognized a significant exception. The history of the exception shows that it stems in part from *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), and in part from the concurring opinion of Brennan, J., joined by Douglas and Marshall, JJ., in *Ashe v. Swenson,* 397 U.S. 436, 453–454, 90 S.Ct. 1189, 1199–1200, 25 L.Ed.2d 469 (1970). *Diaz* held that the Double Jeopardy Clause did not bar a prosecution for homicide subsequent to a conviction for assault and battery because at the trial of the assault and battery the death of the victim had not ensued. 223 U.S. at 448–449, 32 S.Ct. at 251. Brennan, J. in his concurring opinion in *Ashe* advocated the application of the "same transaction" test to the Double Jeopardy Clause. He said, 397 U.S. at 453–454, 90 S.Ct. at 1199–1200:

> In my view, the Double Jeopardy Clause requires the prosecution,[7] except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction.

He gave an example of a "limited circumstance" in his footnote 7:

> For example, where a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other

crimes arising from the same transaction, an exception to the "same transaction" rule should be made to permit a separate prosecution.

Thus, he suggested that there be engrafted on the *Diaz* holding the "due diligence" concept. In *Brown v. Ohio*, 432 U.S. at 169, 97 S.Ct. at 2227, the Court, in declaring that "[w]hatever the sequence [of prosecution] may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense," accepted the exception suggestion of Brennan, J. concurring in *Ashe*. The Court noted in *Brown:*

> An exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence.

*Id.* at 169 n. 7, 97 S.Ct. at 2227 n. 7. The Court cited to *Diaz* and the concurring opinion of Brennan, J., in *Ashe.* In *Illinois v. Vitale*, 447 U.S. 410, 420, n. 8, 100 S.Ct. 2260, 2267, n. 8, 65 L.Ed.2d 228 (1980), the Court referred to the exception indicated in *Brown:*

> We recognized in *Brown v. Ohio*, 432 U.S., at 169, n. 7 [97 S.Ct. at 2227 n. 7] that "[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence."

In *Vitale*, the Court noticed the exception but found it to be inapplicable because the additional facts necessary to sustain the subsequent prosecution had been actually known to the prosecutor at the time of the first prosecution. In *Corbin*, 110 S.Ct. at 2090 n. 7, the Court once more recognized the exception, quoting *Brown* and again citing to *Diaz* and the concurring opinion of Brennan, J., in *Ashe:*

> [W]hen application of our traditional double jeopardy analysis would bar a subsequent prosecution, "[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional

facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence."

Again the exception was deemed inapplicable because the additional facts necessary to sustain the subsequent prosecution had been known to the prosecutor at the time of the first prosecution. *Id.* In the light of the Court's steadfast recognition of the exception, it stands as a vital ingredient of double jeopardy principles. We shall refer to it as the *Diaz* exception.

To this date, the Supreme Court has not had occasion to announce how the applicability of the *Diaz* exception is to be tested. Certainly, it must be objective and not merely reflect the subjective view of the prosecutor. We think that the test is best articulated by calling upon the reasonable person, who is so often relied upon in the law. Accordingly,

a subsequent indictment on a second offense, otherwise barred by the Double Jeopardy Clause of the Fifth Amendment, is not barred if, at the time of prosecution for the earlier offense a reasonable prosecutor, having full knowledge of the facts which were known and in the exercise of due diligence should have been known to the police and prosecutor at that time, would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt.

## V.

In order to prove murder in the first degree in the instant case, the State must show by legally sufficient evidence that Jamie was dead, that Whittlesey killed him, and that the killing was wilful, deliberate and premeditated, or was committed by Whittlesey in the perpetration of robbing or attempting to rob Jamie (felony murder).

Under the *Blockburger* test, subsequent prosecutions for premeditated murder, murder in the second degree and manslaughter, all encompassed in the murder indictment, are not barred by the prior convictions under the robbery indictment. Neither premeditated murder, murder in the

second degree nor manslaughter share identical elements with robbery, assault with intent to rob, or theft, nor are any of them a lesser included offense of premeditated murder, murder in the second degree or manslaughter.

The underlying felony is an essential ingredient of felony murder. *See Newton v. State,* 280 Md. 260, 269, 373 A.2d 262 (1977). In the case *sub judice,* it is readily apparent that the underlying felony is robbery.[5] Robbery therefore, is a lesser included offense of the felony murder. Inasmuch as the charge of robbery filed against Whittlesey had been previously litigated, *Blockburger* bars a subsequent prosecution of him for murder in the first degree based on felony murder, unless the *Diaz* exception applies.

It may be that the State could prove the corpus delicti of premeditated murder or murder in the second degree or manslaughter and the criminal agency of Whittlesey in the perpetration of those crimes without establishing that he robbed Jamie. But we have assumed for the purpose of decision that the prosecution of those crimes, although not barred under *Blockburger,* is barred under *Corbin.* Thus, the convictions of Whittlesey under the robbery indictment would serve as a bar to *any* prosecution under the murder indictment unless the *Diaz* exception applied to permit it.

The fact that Jamie was dead, that the manner of his death was homicide, and that Whittlesey had killed him

---

**5.** "Robbery may be defined as the felonious taking and carrying away of the personal property of another from his person ... by the use of violence or by putting him in fear. The crime, however, is not committed unless there is an intention to deprive the owner permanently of his property or the property of another lawfully in his possession." *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378 (1973), quoting *Hadder v. State,* 238 Md. 341, 354, 209 A.2d 70 (1965). *See West v. State,* 312 Md. 197, 202, 539 A.2d 231 (1988).

Basic robbery and robbery with a deadly weapon (armed robbery) are not separate offenses. They both constitute the same common law felony of "robbery." *Whack v. State,* 288 Md. 137, 140–141, 416 A.2d 265 (1980), *appeal dismissed,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981). The use of a deadly weapon merely calls for a harsher punishment. Md.Code (1957, 1987 Repl.Vol.) Art. 27, §§ 486 and 488.

were not litigated at the trial of the robbery indictment. Proof of those facts, essential for a conviction under the murder indictment, was not at issue in the trial of the robbery indictment. In other words, whether Jamie was dead was not relevant or material to proof of the allegations in the robbery indictment. Of course, when the robbery indictment was returned, the rank odor of foul play hung heavy in the air. But more than suspicion was required. The question is whether the sum of the available evidence when Whittlesey was put in jeopardy for robbery constitutionally compelled the prosecutor, at that time, to seek an indictment against him for murder. He would not be so compelled if the *Diaz* exception applied. Under the test we have adopted, the *Diaz* exception would apply if a reasonable prosecutor, having full knowledge of the facts which were known and in the exercise of due diligence should have been known to the police and the prosecutor at the time, would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt.

## VI.

We shine the light of the test we have adopted on the evidence within the ken of the prosecutor when the robbery indictment was returned. The stories Whittlesey related concerning his association with Jamie at the time of Jamie's disappearance were conflicting to say the least. He told Mr. Griffin: "There's nothing wrong with Jamie. Jamie is fine." The story about the trip to Washington proved to be a fabrication. He gave different accountings of his possession of Jamie's tape recorder and tapes. He lured Strathy to Gun Powder State Park with the yarn that they were to dig up gold and silver. He told his girl friend that Jamie had dropped him off at Golden Ring Mall after the alleged trip to Washington, but he told Mr. Griffin and the police that Jamie had returned in the van with the two friends. Gainsaying his assurance to Mr. Griffin that there was nothing wrong with Jamie, Whittlesey later indicated Jamie was dead, but his various accountings of the death did not jibe—Jamie died from a head wound incurred when he ran

into a tree while high on dope; Whittlesey's brother had killed Jamie in an argument over money; Whittlesey had pushed Jamie, who fell against a tree, hit his head and bled to death. On the other hand, he indicated to a cellmate that Jamie was alive and that they had robbed banks together in several states. It appeared that Whittlesey was either out of touch with reality or a consummate liar. In doubt was which story Whittlesey told, if any, was the true version.

Impressed on Whittlesey's differing versions concerning Jamie was the fact that a body had not turned up to support that Jamie was dead. No matter how "due diligence" is perceived, no discussion is needed to conclude that the authorities exercised "due diligence" in their attempts to solve Jamie's mysterious disappearance. The State correctly recognizes that under proper circumstances, it is not necessary to produce a body to prove the corpus delicti of murder. *See Hurley v. State*, 60 Md.App. 539, 483 A.2d 1298 (1984). But here, absent a body and lacking, therefore, an expert opinion as to the manner and cause of death, it would be difficult to establish, by way of circumstantial evidence, the elements called for under the murder indictment, namely, that Jamie was dead, that the manner of his death was felonious homicide, and that Whittlesey had killed him. The difficulty was compounded by the various versions offered by Whittlesey, which at the very least, clouded whatever may have been the true facts of Jamie's disappearance.

We think, in the light of the facts which were known at the time of the robbery indictment, and considering that there were facts which were then unknown despite the exercise of due diligence, a reasonable prosecutor would not be satisfied that he or she would be able to establish Whittlesey's guilt beyond a reasonable doubt. Thus, the *Diaz* exception applies and serves to permit prosecution on the murder indictment. The Double Jeopardy Clause interposes no bar to prosecution under that indictment.

Whittlesey, arguing to the contrary, points out that the judge who sentenced him upon his convictions under the

robbery indictment said the evidence presented at the trial "leaves no doubt in my mind ... that Jamie Griffin is dead. I have no reason in this world to believe otherwise." The judge was satisfied that Whittlesey was the killer; he departed from the sentencing guidelines and imposed the maximum punishment permitted by the law. Whittlesey urges, in effect, that if the evidence adduced at the robbery trial was so overwhelming with respect to his criminal involvement in Jamie's death as to convince the trial judge that he was the killer, the prosecutor should have been so aware and charged him with murder. In the first place, Whittlesey was not defending a murder charge. The judge did not know what evidence Whittlesey would have adduced and what strategy and tactics he would have employed were he defending a charge of murder rather than charges of robbery and theft. Furthermore, the judge at the hearing on the motion to dismiss reached an opposite conclusion on the same evidence. He had before him by way of a transcript of the robbery trial the evidence that was before the trial judge. But, the hearing judge thought that the evidence was not sufficient to show that the State knew that Jamie was dead. The hearing judge opined:

> Even if [the State] assumed [Jamie was dead], without a body, there was no evidence of homicidal conduct.... Because there was no body, there was absence of critical evidence to charge and prove motive, malice, intent and manner of death.

In any event, in the exercise of our independent constitutional appraisal, as we have seen, we do not sift the evidence or find facts. When the facts are undisputed, as here, we apply the law to them. A trial judge's conclusion on a constitutional issue is not tested by the clearly erroneous rule. Thus, here, neither the trial judge's belief nor the hearing judge's belief influences our constitutional appraisal.

### VII.

Whittlesey asserts:

The State's decision not to charge [Whittlesey] was based solely on a desire to get more evidence to increase the chances of getting a murder conviction and not on insufficiency of the evidence.

He declares, without citation of authority; "The recognized legal standard, however, is 'sufficiency of the evidence,' not 'more evidence.'" He points out that the State conceded in oral argument at the hearing on the motion to dismiss that it *could* have brought a murder charge at the time it obtained the robbery indictment because there was probable cause then to support a charge of murder. But, the State posited, it was not constitutionally compelled to do so.

Contrary to Whittlesey's assertion, we think that the recognized legal standard for bringing a charge provides more leeway to a prosecutor than Whittlesey would give. It reaches beyond probable cause to believe that a crime has been committed by the suspect.

In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) the Court addressed the obligation of a prosecutor to seek an indictment in the frame of reference of the constitutional guarantees of due process of law. In an opinion delivered by Marshall, J., in which Burger, C.J., and Brennan, Stewart, White, Blackmun, Powell, and Rehnquist, JJ., joined, the Court declared:

It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the subject's guilt beyond a reasonable doubt.

*Id.* at 790–791, 97 S.Ct. at 2048–49, quoting *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966) (footnote omitted). "To impose such a duty," the

Court continued, " 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.' " *Id.*, quoting *Ewell* at 120, 86 S.Ct. at 776. "From the perspective of potential defendants," the Court explained:

> requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *[United States v.] Marion,* [404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)], a formal accusation may "interfere with the defendant's liberty, ... disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."

*Lovasco,* 431 U.S. at 791, 97 S.Ct. at 2049, quoting *Marion* 404 U.S. at 320, 92 S.Ct. at 463 (footnote omitted). "From the perspective of law enforcement officials," the Court went on,

> a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.

*Id.* 431 U.S. at 791–792, 97 S.Ct. at 2049–50 (footnotes omitted). Furthermore, the Court rejected the argument that

> once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be

constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete.

*Id.* at 792, 97 S.Ct. at 2050. "Adopting such a rule," the Court observed, "would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause." *Id.* The Court noted that "insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions." *Id.* at 793, 97 S.Ct. at 2050. So it is that neither probable cause [6] to believe that a suspect has committed an offense nor the availability of evidence legally sufficient to prove the guilt of a suspect beyond a reasonable doubt,[7] constitutionally compels a prosecutor to go forward with prosecution forthwith. Of course, prosecutors desire to present as strong a case as possible, and this may require further investigation. *Lovasco* recognized that an "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to

---

6. In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). "'The substance of all of the definitions' of probable cause 'is a reasonable ground for belief of guilt.'" *Id.* at 175, 69 S.Ct. at 1310, quoting *McCarthy v. DeArmit,* 99 Pa.St. 63, 69 (1881), which was quoted with approval in *Carroll v. United States,* 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). It is a practical nontechnical conception. The determination of probable cause is "an act of judgment formed in the light ... of all the circumstances." *Brinegar,* 338 U.S. at 176, 69 S.Ct. at 1311.

7. The test for the legal sufficiency of the evidence is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Wilson v. State,* 261 Md. 551, 563–564, 276 A.2d 214 (1971). See *Wilson v. State,* 319 Md. 530, 535–536, 573 A.2d 831 (1990).

gain tactical advantage over an accused,' *United States v. Marion,* 404 U.S. [307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971)], precisely because investigative delay is not so one-sided." *Lovasco,* 431 U.S. at 795, 97 S.Ct. at 2051. Such an investigative delay does not necessarily offend the Due Process Clause of the Fifth Amendment. *Id.*

> Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.[8]

*Id.* The teachings of *Lovasco* stand vital in the law. They have been applied, for example, in *Howell v. Barker,* 904 F.2d 889, 894–895 (4th Cir.1990); *United States v. Automated Medical Laboratories, Inc.,* 770 F.2d 399, 403–404 (4th Cir.1985); *United States v. Williams,* 684 F.2d 296, 301 (4th Cir.1982); *United States v. Naserkhaki,* 713 F.Supp. 190, 192 (E.D.Va.1989); *United States v. Beall,* 581 F.Supp. 1468, 1469–1470 (D.Md.1984); *United States v. Sample,* 565 F.Supp. 1166, 1181–1182 (E.D.Va.1983). Even though the State conceded that there might have been probable cause to arrest Whittlesey for murder at the time the robbery indictment was returned, in the circumstances here, the State was entitled to continue its investigation in an attempt to find Jamie's body rather than put its case at risk by an

---

For a discussion of "reasonable doubt" see *Lambert v. State,* 193 Md. 551, 558–561, 69 A.2d 461 (1949). See also *Poole v. State,* 295 Md. 167, 186, 453 A.2d 1218 (1983); *Montgomery v. State,* 292 Md. 84, 92–95, 437 A.2d 654 (1981); *Lansdowne v. State,* 287 Md. 232, 239–243, 412 A.2d 88 (1980).

8. The Court was aware that

> [t]he determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions.

*United States v. Lovasco,* 431 U.S. 783, 793, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Justice White, however, would have the Court explicate the teachings of *Lovasco* to assure uniformity of their application by the lower courts. *See Hoo v. United States,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988) (White, J. dissenting from a denial of a writ of certiorari).

immediate prosecution. No more than does the Double Jeopardy Clause, does due process interpose a bar to prosecution under the murder indictment.

## VIII.

Justice is not a one-way street. "A fair trial is the entitlement of the 'People' as well as of an accused." *Gonzales v. State,* 322 Md. 62, 74, 585 A.2d 222 (1991). The delay in seeking the murder indictment was not to obtain a tactical advantage when no additional evidence was required. Nor did it represent an example of an unfortunate lapse in orderly prosecutorial procedures. The delay was prompted by the prosecutor's considered judgment that further investigation was required before the State, with reasonable probability, would be able to convince a jury that Whittlesey was guilty. As we have seen, the investigation continued until Jamie's remains were found. We agree with the hearing court that the delay may not be attributed to lack of adequate preparation and foresight. We recognize the need for scrupulous adherence to our constitutional principles, but the delay here did not offend those principles. Specifically, in answer to the question presented to us, the delay was not abhorrent to the Double Jeopardy Clause of the United State's Constitution. Justice O'Connor observed in her concurring opinion in *Garrett v. United States,* 471 U.S. at 796, 105 S.Ct. at 2420:

> Decisions by this Court have consistently recognized that the finality guaranteed by the Double Jeopardy Clause is not absolute, but instead must accommodate the societal interest in prosecuting and convicting those who violate the law.

She pointed out that

> successive prosecution on a greater offense may be permitted where justified by the public interest in law enforcement and the absence of prosecutorial overreaching.

*Id.* She added that a decision to delay prosecution

> necessarily and appropriately depend[s] on prosecutorial judgments concerning the adequacy of the evidence, the

efficient allocation of enforcement resources, and the desirability of seeking ... severe sanctions.

*Id.* at 798, 105 S.Ct. at 2421. Clearly, the circumstances here do not suggest prosecutorial overreaching, and certainly, the prosecution of Whittlesey for murder is justified by the public interest in law enforcement, accommodating the societal concern in prosecuting and convicting those who violate the law. On this record, Whittlesey is not entitled to use the Double Jeopardy Clause as a weapon to prevent the State from its prosecution on the murder indictment.

■■■ We reiterate our conclusion that the prosecution of Whittlesey on the murder indictment is not barred. The State may seek conviction for murder in the first degree on the basis that the homicide was premeditated or was committed in the perpetration of robbery, or it may seek conviction for murder in the second degree, or for manslaughter. And in light of our conclusion, if Whittlesey is found guilty of murder in the first degree, the State may seek a sentence of death even though the aggravating circumstance, as stated in the notice to Whittlesey, is that the murder "was committed while [he] was committing or attempting to commit the robbery of James Griffin on April 2, 1982...."

We hold that the Circuit Court for Caroline County did not err in its denial of Whittlesey's motion to dismiss the murder indictment. The judgment of that court is

AFFIRMED, WITH COSTS.

ELDRIDGE, J., concurs and dissents and files an opinion.

ROBERT M. BELL, J., dissents and files an opinion joined by CHASANOW, J.

ELDRIDGE, Judge, concurring in part and dissenting in part:

The majority holds that, unless the exception set forth in *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), is applicable to this case, the Fifth Amendment's double jeopardy prohibition would bar the defendant's sub-

sequent prosecution for felony murder because of the earlier prosecution for the underlying felony of robbery. In addition, the majority assumes that, in light of *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), "the convictions of Whittlesey under the robbery indictment would serve as a bar to *any* prosecution under the murder indictment unless the *Diaz* exception applied to permit it." (326 Md. at 526, 606 A.2d at 237).

The majority holds, however, that the *Diaz* exception is applicable in this case and that, therefore, the Double Jeopardy Clause of the Fifth Amendment does not bar the prosecution of the defendant for murdering James Griffin even though the defendant had earlier been convicted and sentenced for robbing James Griffin and for theft.[1]  Furthermore, the majority expresses the view that "the State may seek a sentence of death even though the aggravating circumstance, as stated in the notice to Whittlesey, is that the murder 'was committed while [he] was committing or attempting to commit the robbery of James Griffin ...' " (326 Md. at 535, 606 A.2d at 241).

(1)

Insofar as the defendant's motion to dismiss sought to preclude the State from prosecuting the defendant for intentional, deliberate and premeditated first degree murder [2] or to preclude the State from prosecuting the defen-

---

**1.** The majority emphasizes that its holding in this case is based solely on the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution because the defendant's arguments below and before this Court "look only to that clause" (326 Md. at 521–522, 606 A.2d at 253).  Presumably this Court's position concerning the applicability of Maryland's common law double jeopardy prohibition under similar circumstances must be resolved in a future case where the issue is raised.  The leading cases setting forth the pertinent common law principles regarding this issue include *State v. Littlefield*, 70 Me. 452, 458 (1880), and cases there cited; *Commonwealth v. Roby*, 29 Mass. 496, 505–506 (Mass.1832, per Shaw, C.J.); *Commonwealth v. Evans*, 101 Mass. 25, 26–27 (1869).

**2.** Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 407, provides as follows:

dant for an intentional killing amounting to second degree murder, I agree that the trial court's denial of the motion should be affirmed. My concurrence, however, rests on an entirely different ground from that relied upon by the majority.

As the majority points out, felony murder and the underlying felony are deemed the same offense for double jeopardy purposes, and thus one may not ordinarily be prosecuted for felony murder after he has been prosecuted and convicted for the underlying felony. *See, e.g., Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Brown v. Ohio,* 432 U.S. 161, 168, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187, 196 (1977); *State v. Frye,* 283 Md. 709, 715–716, 393 A.2d 1372, 1375 (1978); *Newton v. State,* 280 Md. 260, 265–269, 373 A.2d 262, 265–266 (1977).

It is equally well-established, however, that a felony such as robbery, rape, or kidnapping, and a wilful, deliberate and premeditated murder (or any species of murder other than felony murder), both arising out of the same transaction, are *not* deemed the same offense for double jeopardy purposes. *See, e.g., State v. Frye, supra,* 283 Md. at 716, 393 A.2d at 1376 ("if a first degree murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under Art. 27, § 407, then the murder, even though committed in the course of a felony, would not be deemed the same offense as the felony ..."); *Newton v. State, supra,* 280 Md. at 269, 373 A.2d at 267; *Robinson v. State,* 249 Md. 200, 209–211, 238 A.2d 875, 881–882, *cert. denied,* 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265 (1968); *Williams v. Smith,* 888 F.2d 28, 29–30 (5th Cir.1989); *Swafford v. State,* 498 N.E.2d 1188, 1191 (Ind.1986); *Commonwealth v. Harper,* 346 Pa.Super. 105, 115–116, 499 A.2d 331, 337 (1985), *app. denied,* 515 Pa. 599, 528 A.2d 955 (1987);

---

"**§ 407. First degree murder—Generally.**
    All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

*State v. Adams,* 418 N.W.2d 618, 624–625 (S.D.1988); *Simpson v. Commonwealth,* 221 Va. 109, 113–114, 267 S.E.2d 134, 137–138 (1980).

Consequently, under long-established double jeopardy principles, the double jeopardy prohibition does not bar the prosecution of a defendant for an intentional homicide, even though the defendant was earlier prosecuted and convicted for robbing, raping, or kidnapping the same victim. *See, e.g., Bowers v. State,* 298 Md. 115, 140–143, 468 A.2d 101, 114–116 (1983) (earlier kidnapping prosecution and conviction did not preclude subsequent murder prosecution where the murder prosecution was based on proof of willfulness, premeditation and deliberation); *Potts v. Zant,* 734 F.2d 526, 531 (11th Cir.1984), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1386, 89 L.Ed.2d 610 (1986); *Owsley v. Cunningham,* 190 F.Supp. 608, 612 (E.D.Va.1961); *Carmody v. Seventh Judicial District Court,* 81 Nev. 83, 85–86, 398 P.2d 706, 707, 11 A.L.R.3d 828, 832–833 (1965).

The majority opinion assumes, however, that under the Supreme Court's opinion in *Grady v. Corbin, supra,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548, the earlier prosecution of a defendant for robbery would ordinarily preclude a later prosecution of the defendant for the wilful, deliberate and premeditated murder of the same victim where both the robbery and the murder were parts of the same transaction. In my view this assumption is highly doubtful, and I would not indulge in the assumption for purposes of reviewing the trial court's denial of the pre-trial motion to dismiss.

The Supreme Court in *Grady v. Corbin, supra,* 495 U.S. at 508, 110 S.Ct. at 2087, 109 L.Ed.2d at 557, held

"that the Double Jeopardy Clause bars a subsequent prosecution if, to establish an element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted."

The Court made it clear, however, that the above-quoted standard

"is not an 'actual evidence' or 'same evidence' test. The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct." 495 U.S. at 522, 110 S.Ct. at 2093, 109 L.Ed.2d at 564."

Although arguing that the *Grady v. Corbin* holding is applicable in this case, the defendant did not attempt to identify specifically the "conduct" which "constitutes an offense for which the defendant has already been prosecuted" and which must be proven in order to establish an element of wilful, deliberate and premeditated first degree murder, or an intentional killing amounting to second degree murder. Instead, the defendant simply asserted that all of the offenses "arose from the same transaction...." [3] The Supreme Court and this Court, however, have repeatedly rejected the "same transaction" test as the standard for determining whether distinct offenses are to be deemed "the same offense" for double jeopardy purposes. *See, e.g., Garrett v. United States,* 471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764, 779 (1985); *State v. Boozer,* 304 Md. 98, 113–114, 497 A.2d 1129, 1137 (1985); *Cousins v. State,* 277 Md. 383, 389–397, 354 A.2d 825, 829–831, *cert. denied,* 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976), and cases there cited. Recently, since its decision in *Grady v. Corbin, supra,* the Supreme Court has reiterated that its prior cases

---

**3.** In his brief, the entire substance of the defendant's argument based on *Grady v. Corbin* is as follows (appellant's brief, p. 18):

"The conduct the State will need to prove the murder is essentially the same conduct required to prove the offenses in the first prosecution: the robbery, the assault with intent to rob and the theft(s). All the offenses arose from the same transaction, which occurred on April 2, 1982 in a wooded area at Gunpowder State Park. The State has already conceded this point in argument on the motion to dismiss and through the identification of the aggravating circumstance in the death notice (filed June 11, 1990, pursuant to Article 27, Section 413(d)(10), of the Annotated Code of Maryland: 'The murder was committed while the Defendant was committing or attempting to commit the robbery of James Griffin ...' Under *Grady,* the Double Jeopardy Clause bars a second prosecution if, to establish an essential element of an offense charged, the State will prove conduct for which the appellant has already been prosecuted."

have rejected the "same transaction" test. *United States v. Felix*, —— U.S. ——, 112 S.Ct. 1377, 1384–1385, 118 L.Ed.2d 25 (1992).

The scope of the *Grady v. Corbin* holding is not entirely clear. Nevertheless, the Supreme Court's focus in the *Grady* opinion upon establishing an "element" of the charged offense by proving "conduct that constitutes" the earlier "offense," coupled with the rejection of the "actual evidence" and the "same transaction" tests, suggests that the *Grady* standard is applicable only when the conviction of the earlier offense will, as a matter of law (and not simply because of the particular underlying facts), fully establish an element of the later offense. *See, e.g., United States v. Clark*, 928 F.2d 639, 642 (4th Cir.1991). Although *Grady v. Corbin* liberalized somewhat the so-called "required evidence" or *"Blockburger"* [4] test for determining when two offenses should be deemed the same for purposes of the double jeopardy prohibition against successive prosecutions, the Supreme Court has cautioned against reading the language of *Grady* "expansively." *United States v. Felix, supra*, 112 S.Ct. at 1384. The Court has indicated that, under the *Grady* test, the earlier offense "might be viewed as a 'species of lesser-included offense,'" in the same manner as the underlying felony is a lesser included offense of felony murder. *United States v. Felix, supra*, 112 S.Ct. at 1384, quoting *Illinois v. Vitale*, 447 U.S. 410, 420, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228, 238 (1980), discussing *Harris v. Oklahoma, supra.*

Turning to the present case, a conviction for robbery in no way establishes an element of wilful, deliberate and premeditated murder. Unlike the situation involving a conviction for the underlying felony followed by a felony murder prosecution, the earlier robbery conviction in this case does not amount to an alternate element of wilful, deliberate and premeditated murder. Although robbery

---

**4.** *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

requires proof of force or threat of force, the force required to prove robbery does not legally or necessarily establish any act which is an element of intentional homicide. Consequently, I do not believe that the prosecution for wilful, deliberate and premeditated murder is precluded by the *Grady v. Corbin* test.

There may be some cases where the force used to commit the robbery is factually identical to the force employed to carry out an intent to kill, and there may be some cases where it is different even though the robbery and the homicide may be part of the same transaction. If one were to assume, arguendo, that the *Grady v. Corbin* test might be applicable if the State's evidence of force to establish an intentional homicide were identical to the evidence which had earlier been used to prove robbery, the result would not be different here. In the present case, we do not at this time know whether the State will use the identical evidence of force, previously relied on in the robbery prosecution, to attempt to prove the intentional killing, or whether the evidence designed to prove the intentional killing will be somewhat different. Thus, even under an expansive view of *Grady v. Corbin*, it would be premature at this stage of the case to conclude that the State may not prosecute the defendant for wilful, deliberate and premeditated murder.

Finally, the Supreme Court recently indicated that its holding in *Grady v. Corbin* was not intended to change "longstanding authority" concerning the inapplicability of the double jeopardy prohibition or to upset "established doctrine" as to what are deemed the "same offenses" within the meaning of the Double Jeopardy Clause. *United States v. Felix, supra*, 112 S.Ct. at 1385. *Cf. Apostoledes v. State*, 323 Md. 456, 467–469, 593 A.2d 1117, 1123–1124 (1991). As earlier discussed, it has been uniformly held and long-established that a felony such as robbery, and a wilful, deliberate and premeditated murder, both arising out of the same transaction, are not deemed the same offense for double jeopardy purposes. I would continue to adhere to this principle.

(2)

While I agree that the State should be able to prosecute the defendant for wilful, deliberate and premeditated first degree murder, or for an intentional killing amounting to second degree murder, I do not agree that the State should be allowed to prosecute the defendant for murder based upon a felony murder theory, with the underlying felony being the robbery for which the defendant had earlier been prosecuted, convicted and sentenced. Such a felony murder prosecution violates the Fifth Amendment's Double Jeopardy Clause under the principles set forth in *Harris v. Oklahoma, supra,* 433 U.S. at 682–683, 97 S.Ct. at 2913, 53 L.Ed.2d at 1056; *Brown v. Ohio, supra,* 432 U.S. at 168, 97 S.Ct. at 2227, 53 L.Ed.2d at 196; *Bowers v. State, supra,* 298 Md. at 140–143, 468 A.2d at 114–116; *State v. Frye, supra,* 283 Md. at 715–716, 393 A.2d at 1375; and *Newton v. State, supra,* 280 Md. at 265–269, 373 A.2d at 265–266. Under the facts of this case, a felony murder prosecution does not, I submit, fall within the so-called "exception" recognized in *Diaz v. United States, supra,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500.

In *Diaz,* the defendant was first prosecuted for assault and battery and was subsequently prosecuted for homicide. The Supreme Court held that the successive prosecutions did not violate the double jeopardy prohibition for the following reason (223 U.S. at 449, 32 S.Ct. at 251, 56 L.Ed. at 503):

"The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense."

This Court in *Newton v. State, supra,* recognized the applicability of the *Diaz* exception in the context of a prosecution for felony murder following an earlier prosecution for the underlying felony (280 Md. at 274 n. 4, 373 A.2d at 269 n. 4):

"[A] subsequent prosecution for felony murder is not barred by a previous prosecution for the underlying felony where the victim dies after the first prosecution. Because the death of the victim does not occur until after the first prosecution, the accused is not in jeopardy for the crime of murder at the time of the first prosecution. *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912)...."

It is clear that the rationale for the *Diaz* exception to the double jeopardy prohibition, as set forth by the Supreme Court in the *Diaz* opinion and by this Court in *Newton,* has no application to the situation where the death of the victim had occurred at the time of the first prosecution. The *Diaz* rationale is that the subsequent prosecution for the greater offense is not barred when a necessary element of the greater offense had not occurred at the time of the earlier prosecution. In the instant case, of course, all of the elements of felony murder were in existence at the time of the robbery prosecution.

Only once since *Diaz* has the Supreme Court applied the exception to permit a subsequent prosecution following an earlier conviction on a lesser included offense. In *Garrett v. United States, supra,* 471 U.S. at 786–793, 105 S.Ct. at 2415–2419, 85 L.Ed.2d at 776–781, the defendant had been convicted in a federal court in the State of Washington on May 18, 1981, on a charge of importing 12,000 pounds of marihuana. Subsequently, the defendant was indicted in a Florida federal court on, *inter alia,* a charge of engaging in a "continuing criminal enterprise" in violation of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 848. The defendant moved to dismiss the continuing criminal enterprise charge, arguing that the Washington importation conviction was on a lesser included offense and that, under *Brown v. Ohio, supra,* a subsequent prosecution on the greater offense was barred by the Double Jeopardy Clause of the Fifth Amendment. The Supreme Court "assume[d], for purposes of decision here, that the Washington offense was a lesser included offense,"

but the Court held that the case fell within the *Diaz* exception to the double jeopardy prohibition, 471 U.S. at 790–791, 105 S.Ct. at 2417, 85 L.Ed.2d at 778–779. After quoting extensively from the *Diaz* opinion, the Supreme Court stated (471 U.S. at 791, 105 S.Ct. at 2418, 85 L.Ed.2d at 779):

> "In the present case, as in *Diaz*, the continuing criminal enterprise charged against Garrett in Florida had not been completed at the time that he was indicted in Washington. The latter event took place in March 1981, whereas the continuing criminal enterprise charged in the Florida indictment and found by the trial jury extended from January 1976 to July 1981."

The Court later reiterated that the case fell "under the *Diaz* rule" because "the continuing criminal enterprise charged by the Government had not been completed at the time the Washington indictment was returned ...," 471 U.S. at 792, 105 S.Ct. at 2418, 85 L.Ed.2d at 780.

Consequently, the only two cases in which the United States Supreme Court has applied the so-called *Diaz* exception to permit a subsequent prosecution for a greater offense after a conviction for a lesser included offense were cases where the greater offense had not occurred at the time of the earlier prosecution. Moreover, as previously indicated, the reasoning of the *Diaz* and *Garrett* opinions would not support an exception to the double jeopardy prohibition where the greater offense had fully occurred at the time of the earlier prosecution on the lesser included offense. Neither the United States Supreme Court nor this Court nor any other State Supreme Court, to the best of my knowledge, has applied the so-called *Diaz* exception where the greater offense had fully occurred when the lesser included offense was prosecuted.[5]

---

5. The only cases found by the State and the majority, applying the *Diaz* exception where the greater offense had occurred when the prosecution on the lesser included offense took place, are decisions of the United States Court of Appeals for the Ninth Circuit and the

There is some language in a few opinions by the United States Supreme Court indicating that the *Diaz* exception *may* apply in limited circumstances when the greater offense had occurred at the time of the prosecution for the lesser included offense. Thus in *Brown v. Ohio, supra,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7, 53 L.Ed.2d at 196 n. 7, the Supreme Court stated (emphasis added):

"An exception *may* exist where the State is *unable* to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. See *Diaz v. United States....*"

The above language from *Brown v. Ohio* was quoted in *Grady v. Corbin, supra,* 495 U.S. at 516 n. 7, 110 S.Ct. at 2090 n. 7, 109 L.Ed.2d at 561 n. 7, and in *Illinois v. Vitale, supra,* 447 U.S. at 420 n. 8, 100 S.Ct. at 2267 n. 8, 65 L.Ed.2d at 238 n. 8. In *Jeffers v. United States,* 432 U.S. 137, 151–152, 97 S.Ct. 2207, 2216–2217, 53 L.Ed.2d 168, 180–181 (1977), decided the same day as *Brown v. Ohio,* the possibility of a broadened *Diaz* exception was set forth as follows (emphasis added):

"The rule established in *Brown,* however, does have some exceptions. One commonly recognized exception is when all the events necessary to the greater crime have not taken place at the time the prosecution for the lesser is begun. See *Brown v. Ohio,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227; *Blackledge v. Perry,* 417 U.S. 21, 28–29, and n. 7, 94 S.Ct. 2098, 2102–2103, 40 L.Ed.2d 628 (1974); *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912). See also *Ashe v. Swenson,* 397 U.S. 436, 453 n. 7, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). This exception may also apply when the facts necessary to the greater were not discov-

---

intermediate appellate court in the State of Washington. *See United States v. Stearns,* 707 F.2d 391 (9th Cir.1983), *cert. denied,* 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); *State v. Escobar,* 30 Wash.App. 131, 633 P.2d 100 (1981).

ered despite the exercise of due diligence before the first trial. *Ibid.*"

As the above-quoted language shows, the Supreme Court has not taken the position that the *Diaz* exception extends beyond the situation involved in the *Diaz* and *Garrett* cases. Rather, the Court has simply recognized the possibility that the exception might apply under certain circumstances where the greater offense had occurred at the time of the prosecution for the lesser included offense. Furthermore, the Court's language in describing the possible expanded exception indicates that, if adopted, it would be limited to circumstances where, at the time of the prosecution for the lesser offense, the government is *unable* to prosecute for the greater offense because the *necessary facts have not been discovered.* This is entirely different from the exception formulated today by the majority, namely that a successive prosecution is not barred if, at the time of the earlier prosecution, a reasonable prosecutor "would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt." (326 Md. at 525, 606 A.2d at 236).

The inconsistency between the double jeopardy exception formulated by the majority today, and the possible exception described by the Supreme Court, becomes clear upon an examination of *Grady v. Corbin, supra,* and *Illinois v. Vitale, supra.* In *Grady v. Corbin, supra,* 495 U.S. at 516 n. 7, 110 S.Ct. at 2090 n. 7, 109 L.Ed.2d at 561 n. 7, after quoting *Brown v. Ohio, supra,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7, 53 L.Ed.2d at 196 n. 7, that there may be an exception to the double jeopardy prohibition when the necessary facts have not been discovered, the Supreme Court went on to state that because the prosecution "was informed of [the victim's] death on the night of the accident, such an exception is inapplicable here." Similarly in *Illinois v. Vitale, supra,* 447 U.S. at 420 n. 8, 100 S.Ct. at 2267 n. 8, 65 L.Ed.2d at 238 n. 8, again after quoting *Brown v. Ohio, supra,* the Court stated that the possible "exception is not applicable here because the trial court found that the

prosecution was aware that Vitale's accident had resulted in two deaths at the time he was prosecuted for failing to reduce speed."[6] The language in the Supreme Court's opinions does not suggest that a possible expanded *Diaz* exception depends upon whether a prosecutor would be satisfied that he could prove the defendant's guilt beyond a reasonable doubt. Instead, the expanded exception is based on lack of awareness that the elements of the greater offense have occurred. The two concepts are quite different. A prosecutor's knowledge can be such that he is aware, or should be aware, that an offense has occurred, without the prosecutor necessarily being satisfied that he can prove a particular defendant's guilt beyond a reasonable doubt.

To reiterate, the Supreme Court's opinions have clearly indicated that if the so-called *Diaz* exception to the double jeopardy prohibition is to be broadened, the broadened exception would permit a subsequent prosecution for a greater offense, after an earlier conviction on a lesser included offense, only when the government, at the time of the first prosecution, was not aware, and should not have been aware, that the elements constituting the greater offense had occurred. For the reasons set forth in Judge Bell's dissenting opinion, the State in the present case, at the time of the earlier prosecution for robbery, was or should have been aware that the victim was dead. In fact, as Judge Bell points out in his dissenting opinion, the maximum sentences imposed upon the defendant at the conclusion of the earlier prosecution reflected the trial judge's belief that the victim had been killed in the course of the robbery. Therefore, even under an expanded *Diaz* exception suggested as a possibility by the Supreme Court,

---

6. *See also Gianiny v. State,* 320 Md. 337, 341 n. 3, 577 A.2d 795, 796–797 n. 3 (1990) (where, after citing *Diaz* and other Supreme Court opinions, this Court stated that "[i]n the case *sub judice,* the State conceded that the officer who served the traffic citations on Gianiny was aware at the time that the driver of the other vehicle had died").

a subsequent prosecution of the defendant based on a theory of felony murder should be precluded.[7]

The majority opinion has created an exception to the Fifth Amendment's Double Jeopardy Clause which has utterly no support in opinions of the Supreme Court or elsewhere. The majority would permit successive prosecutions for lesser included and greater offenses whenever a prosecutor, at the time of the first prosecution, is not satisfied that he or she would be able to establish beyond a reasonable doubt the defendant's guilt with regard to the greater offense. The majority, in support of its action, asserts that "the prosecution of Whittlesey for murder is justified by the public interest in law enforcement, accommodating the societal concern in prosecuting and convicting those who violate the law." (326 Md. at 535, 606 A.2d at 241). This nation has endured for over 200 years adhering to the principle that the public interest in law enforcement should not override constitutional guarantees, such as the Double Jeopardy Clause of the Fifth Amendment. Moreover, as pointed out in part (1) of this opinion, the Double Jeopardy Clause does not preclude the prosecution of Whittlesey for wilful, deliberate and premeditated murder or for any species of murder other than felony murder. The conclusion is inescapable that the majority has invented a new exception to the Double Jeopardy Clause of the Fifth Amendment in order to achieve a result desired by the majority in the present case. Such an approach does not engender respect for the law.

---

7. In addition to concluding that the defendant may be prosecuted for murder on any theory, including felony murder, the majority also says that the prosecution may seek the death sentence based on the aggravating factor that the murder was committed in the course of a robbery. This conclusion appears to be based on the majority's new double jeopardy test; the majority does not deal separately with the matter of prosecuting the defendant for capital murder based on the robbery for which the defendant had previously been convicted as the sole aggravating factor. Moreover, the matter was not raised in the trial court or in the briefs in this Court. Consequently, I express no view upon the issue at this time.

ROBERT M. BELL, Judge, dissenting.

Hard cases make bad law. This tragic case involves the murder and robbery of a young man named James Rowan Griffin (Jamie), which occurred in 1982. His killer was prosecuted in 1984, but only for the robbery and related offenses, not for Jamie's murder. After an agonizing, but undaunted, eight-year search by Jamie's parents, as well as by state and local authorities, Jamie's body was found. Out of its understandable sympathy for the parents of the victim and to correct what, in hindsight, was a gross miscalculation by the prosecution, the majority does what unfortunately is done too often in heart rending cases, it bends the rules and makes bad law. What is at stake in this case is a fundamental principle of law of constitutional proportions, whose venerable heritage spans the common law. Consequently, although I too feel sympathy for the parents of the victim, I must respectfully dissent.

## I.

### A.

The majority has meticulously, and exhaustibly, set forth both the background of the two prosecutions and the facts as they were developed at the robbery trial. From that recital, the following are clear. Whittlesey was not charged with simple theft in 1982;[1] rather, evidencing the prosecution's belief that it had sufficient evidence without Jamie's body, he was charged with, tried for, and convicted of robbery and assault with intent to rob, crimes which required the prosecution to prove that Jamie's property was taken by the use of violence or threat of violence.[2] Al-

---

1. Theft may be committed in several ways, none of which requires the use of force, or threat of force such as an assault. *See* Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 342.

2. "'Robbery may be defined as the felonious taking and carrying away of the [tangible] personal property of another, from his person, or in his presence, by violence or by putting him in fear, [with the intent] to deprive the owner permanently of his property or the

though most of the prosecution's evidence in the robbery trial was circumstantial, not all of it was; there was evidence that Whittlesey's friend, David Strathy, had taped conversations in which Whittlesey admitted that Jamie was dead and commented on the manner of his death.[3] The evidence the prosecution used to prove robbery and assault with intent to rob tended also to prove Jamie's death and that it was directly related to the robbery—that it occurred, either accidentally or intentionally, during the course of the robbery. In addition to the fact that the victim's property was found in Whittlesey's possession, that evidence included testimony concerning Jamie's habits and character, the

property of another lawfully in his possession.'" *State v. Gover*, 267 Md. 602, 606, 298 A.2d 378, 380–81 (1973), quoting *Hadder v. State*, 238 Md. 341, 354, 209 A.2d 70, 77 (1965). *See also Hook v. State*, 315 Md. 25, 30–31, 553 A.2d 233, 236 (1989); *West v. State*, 312 Md. 197, 202, 539 A.2d 231, 232 (1988).

An assault with the intent to rob consists of "(1) an assault on the victim; (2) made by the accused; (3) with the intent to rob." *Bryant v. State*, 4 Md.App. 572, 578, 244 A.2d 446, 450 (1968). Art. 27, § 12.

3. Although Strathy testified that he accompanied Whittlesey to Gunpowder State Park and that Whittlesey told him that they were going to bury a body, he maintained that he never actually saw a body. What he saw, he said, was a red shirt, a jacket, and a tennis shoe underneath a mound covered with pine needles. After poking in the area of the shirt and jacket and finding it "like hard," he left; he never saw a head or any uncovered part of the body. Consequently, although coming close to doing so, Strathy's observations did not provide direct evidence of the *corpus delicti.* His testimony that Whittlesey told him that there was a body buried underneath the pine needles and that it was that of the victim, coupled with assertions made at other times concerning how the victim died, was evidence of the *corpus delicti,* needing only corroboration, *i.e.,* proof of the *corpus delicti* independent of the admission, *Bagley v. State,* 232 Md. 86, 96, 192 A.2d 53, 59 (1963); *Lemons v. State,* 49 Md.App. 467, 473, 433 A.2d 1179, 1183, *cert. denied,* 292 Md. 13 (1981), which need not be by proof beyond a reasonable doubt. *Bagley,* 232 Md. at 96, 192 A.2d at 59; *Pierce v. State,* 227 Md. 221, 226, 175 A.2d 743, 745 (1961). *See Foster v. State,* 230 Md. 256, 258, 186 A.2d 619, 620 (1962). Such proof is "'sufficient if, *when considered in connection with the confession,* it satisfies the jury beyond a reasonable doubt that the offense was committed and that the defendant committed it.'" *Bagley,* 232 Md. at 96, 192 A.2d at 59, quoting *Jones v. State,* 188 Md. 263, 271–72, 52 A.2d 484, 488 (1946) (emphasis added).

efforts the police made to locate Jamie and the previously mentioned taped conversations between Strathy and Whittlesey. Whittlesey gave several different versions of how Jamie died—accidentally, intentionally, and at the hands of a third party—thus undermining the inherent credibility of any one version. Significantly, however, the one thing about which there was virtually no equivocation was that Jamie was dead. Evidence having been adduced tending to prove Jamie's death, the prosecutor argued to the jury that he was, in fact, dead, killed during the robbery. At sentencing, the trial judge stated his belief that Jamie was dead and, apparently based on that, sentenced Whittlesey, a first offender, to a total of 25 years imprisonment: 10 years, the maximum, for robbery, and 15 years, again, the maximum, for theft over $300.00.

### B.

When there has been a prior prosecution for robbery, application of "the Blockburger test" [4] bars a subsequent prosecution for a murder committed during that robbery, *i.e.* for felony murder. Robbery is a lesser included offense of such murder, *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 2913, 53 L.Ed.2d 1054, 1056 (1977); *see State v. Frye*, 283 Md. 709, 715, 393 A.2d 1372, 1375 (1978); *Newton v. State*, 280 Md. 260, 268, 373 A.2d 262, 266 (1977); *see also Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187, 196 (1977), and, hence, for double jeopardy purposes, is deemed the same offense. [5] *Brown*, 432 U.S. at 168, 97 S.Ct. at 2227, 53 L.Ed.2d at 196; *Frye*, 283 Md. at

---

**4.** *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**5.** This result flows from application of the "required evidence test," which is the federal test, *see Grady v. Corbin*, 495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548, 557 (1990); *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932), as well as the Maryland common-law rule. *See Williams v. State*, 323 Md. 312, 316, 593 A.2d 671, 673 (1990) and cases there cited.

715, 393 A.2d at 1375; *Newton,* 280 Md. at 268, 262 A.2d at 266.

In *Grady v. Corbin,* 495 U.S. 508, 516 n. 7, 110 S.Ct. 2084, 2090 n. 7, 109 L.Ed.2d 548, 561 n. 7 (1990), however, the Supreme Court recognized that:

> [W]hen application of our traditional double jeopardy analysis would bar a subsequent prosecution, "[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence."

(quoting *Brown,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7, 53 L.Ed.2d at 196 n. 7). In support of that proposition, the Court cited *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912) and *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In the former, the defendant was tried for, and convicted of, assault and battery. When the victim subsequently died of his injuries, the defendant was charged with, and despite objections raising the bar of double jeopardy, tried for, and convicted of, the victim's murder. Rejecting the double jeopardy argument, the Supreme Court stated:

> The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense.

223 U.S. at 449, 32 S.Ct. at 251, 56 L.Ed. at 503.

In a concurring opinion in *Swenson,* Mr. Justice Brennan urged the joinder in one trial of "all the charges against a defendant that grew out of a single criminal act, occurrence, episode, or transaction," 397 U.S. at 453–54, 90 S.Ct. at 1199, 25 L.Ed.2d at 481, except in limited circumstances

such as "where a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other crimes arising from the same transaction...." 397 U.S. at 453 n. 7, 90 S.Ct. at 1199 n. 7, 25 L.Ed.2d at 481 n. 7. That exception to the traditional double jeopardy analysis was first recognized in *Brown* and reiterated in *Illinois v. Vitale,* 447 U.S. 410, 420 n. 8, 100 S.Ct. 2260, 2267 n. 8, 65 L.Ed.2d 228, 238 n. 8 (1980). Aside from *Diaz* itself, the Court has, to date, applied the *Diaz* exception only once,[6] *see Garrett v. United States,* 471 U.S. 773, 791–95, 105 S.Ct. 2407, 2417–19, 85 L.Ed.2d 764, 779–81 (1985), and then only after expressing "serious doubts as to whether the offense to which Garrett pleaded guilty in Washington was a 'lesser included offense' within the [Continuing Criminal Enterprise] charge so that the prosecution of the former would bar a prosecution of the latter." 471 U.S. at 790, 105 S.Ct. at 2417, 85 L.Ed.2d at 779.

---

**6.** In *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the defendant was convicted of stealing an automobile, having previously been prosecuted and punished for the lesser included offense of operating that automobile without the owner's consent. The facts of *Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) were similar. There, the defendant was involved in an automobile accident in which two children were killed. He was convicted of failing to reduce speed to avoid the accident. Later, based on the same accident, he was charged with involuntary manslaughter. As in *Brown,* the prosecution was aware when it prosecuted the lesser offense, that the greater offense had also been committed, in that case, that the accident had resulted in two deaths. 447 U.S. at 420 n. 8, 100 S.Ct. at 2267 n. 8, 65 L.Ed.2d at 238 n. 8. *Grady, supra* involved an automobile accident in which one person died. The defendant was given two tickets, one charging driving while intoxicated and the other failing to keep to the right of the median, requiring appearance in court on a date certain. When the defendant appeared, he pled guilty to both charges. Notwithstanding that no member of the district attorney's office was present and the presiding judge was unaware that the tickets charged conduct resulting in a fatal accident, given the prosecution's knowledge that a death occurred in the accident, the *Diaz* exception was held not to apply, when the State attempted to prosecute Corbin for, among other things, reckless manslaughter, criminally negligent homicide, and third-degree reckless assault.

**554**

Without direct guidance from the Supreme Court [7] or this Court,[8] the majority, without citation of authority, under-

---

**7.** The Ninth Circuit has applied the *Diaz* exception. In *United States v. Stearns,* 707 F.2d 391 (9th Cir.1983), the defendants, found in possession of a boat belonging to a couple who disappeared two months earlier, were charged with theft and convicted. *Id.* at 392. When, some years later, one victim's skull and bones were discovered, revealing evidence that the couple had been murdered, the defendants were indicted for felony murder. *Id.* Critical to the rejection of the defendants' double jeopardy challenge was the fact that the government had no evidence of foul play prior to commencement of the earlier theft prosecution. After pointing out that the government had acted with "due diligence," the court said:

> Although the government suspected foul play when it discovered the [victims' boat] in appellants' possession, the search produced no evidence of it. The [victims'] campsite was found undisturbed, and neither Palmyra nor the water around it yielded any evidence of the [victims'] fate. The district court's conclusion that the government did not have the facts necessary to sustain the murder charge at the outset was not clearly erroneous.

707 F.2d at 394.

**8.** This Court has not applied the *Diaz* exception to permit a prosecution that was otherwise double jeopardy barred. In *Gianiny v. State,* 320 Md. 337, 577 A.2d 795 (1990), however, we noted that the State was barred under both the Double Jeopardy Clause and Maryland's common-law double jeopardy principles from prosecuting Gianiny for vehicular manslaughter after he had been convicted of, and punished for, negligent driving, a lesser included offense of vehicular manslaughter. In our discussion, we referred to the *Diaz* exception. It was inapplicable, we said, because the police officer who issued the traffic citations was aware that the accident had resulted in the death of the other driver. 320 Md. at 341 n. 3, 577 A.2d at 796–97 n. 3. The Court of Special Appeals applied the *Diaz* exception in *Thomas v. State,* 32 Md.App. 465, 361 A.2d 138 (1976), a case similar to *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912). So, too, has the intermediate appellate court of Washington. *State v. Escobar,* 30 Wash.App. 131, 633 P.2d 100 (1981) involved an initial prosecution for driving while intoxicated and a subsequent one for negligent homicide. The charges arose out of a three car accident in which the driver of one of the cars was killed. The facts known to the prosecution when the defendant was charged with driving while intoxicated were that the defendant was in his proper lane on a two lane road when there was a head-on collision in the other lane, which resulted in one of the cars involved in the collision striking the defendant's car. Although intoxicated driving was an element of the state's negligent homicide statute, the prosecutor had no "substantial" evidence with which to charge the defendant with negligent homicide until it had obtained an expert to reconstruct the accident, and that reconstruc-

takes to formulate a test to determine when the *Diaz* exception is applicable. Under its test,

> a subsequent indictment on a second offense, otherwise barred by the Double Jeopardy Clause of the Fifth Amendment, is not barred if, at the time of prosecution for the earlier offense a reasonable prosecutor, having full knowledge of the facts which were known and in the exercise of due diligence should have been known to the police and prosecutor at that time, would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt.

(326 Md. at 525, 606 A.2d at 236). Armed with this test, and noting preliminarily that the fact of the victim's death, the manner in which it occurred, and Whittlesey's criminal agency were not litigated at the robbery trial, the majority posits the question: "Whether the sum of the available evidence when Whittlesey was put in jeopardy for robbery constitutionally compelled the prosecutor, at that time, to seek an indictment against him for murder." (326 Md. at 527, 606 A.2d at 237). As we shall see, the majority has asked the wrong question.

I agree with the majority up to the point where it recognizes that there may be an exception which permits a prosecution otherwise barred by the double jeopardy prohibition. I do not agree with the majority's interpretation of the exception and certainly not with its conclusion that, under the facts *sub judice*, the exception even permits a prosecution for felony murder.[9] Furthermore, I believe the

---

tion tended to prove the defendant's complicity in the accident. 633 P.2d at 103.

**9.** The majority has "assumed for purposes of decision in this case" that the test announced in *Grady*, 495 U.S. at 510, 110 S.Ct. at 2087, 109 L.Ed.2d at 557, namely:

"the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted," (footnote omitted)

test the majority has formulated is ill-suited to determining whether the *Diaz* exception applies. Finally, I do not agree with the majority that *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) [10] allows a prosecutor, so long as he or she acts reasonably, to initiate some, but not all, charges arising out of a single set of facts, as to which probable cause and sufficient circumstantial evidence to establish a *prima facie* case exist. Whether the prosecutor also believes that convictions could not be obtained as to the charges the prosecutor chooses to forego is simply irrelevant. This authorization to split charges and bring multiple serial prosecutions violates fundamental due process as well as double jeopardy principles.

## II.

### A.

For the *Diaz* exception to apply to the case *sub judice*, when it prosecuted Whittlesey for robbery, the State must have lacked sufficient facts to make out a *prima facie* case that the victim had also been murdered. Viewing, in an objective fashion, the evidence as known or, with due diligence, discoverable, by the prosecutor when the robbery was tried, the critical time, we seek to determine if there was sufficient evidence to make out a *prima facie* case of murder. The test is not unlike that which we apply when reviewing a ruling on denial of a defendant's motion for judgment of acquittal made pursuant to Rule 4–324, *see Brooks v. State*, 299 Md. 146, 150–51 n. 3, 472 A.2d 981, 984 n. 3 (1984) (function of reviewing court is to determine

bars *any* murder prosecution. I make no such assumption. My analysis is limited to determining the applicability of such exception to felony murder.

**10.** This case stands for the proposition that, even when a prosecutor has probable cause to bring a criminal charge and sufficient evidence to prove guilt beyond a reasonable doubt, the prosecutor is not constitutionally required to do so; *i.e.,* there is no violation of due process when the prosecutor delays initiating the prosecution.

whether " 'there is any relevant evidence, properly before the jury, legally sufficient to sustain a conviction.' " Court quoting *State v. Devers*, 260 Md. 360, 371, 272 A.2d 794, 800, *cert. denied, Devers v. Maryland*, 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971)), or the sufficiency of the evidence. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1973) (reviewing court must ask itself, upon review of the sufficiency of the evidence to support a criminal conviction, whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original); *Wiggins v. State*, 324 Md. 551, 556–67, 597 A.2d 1359, 1366–67 (1991). Therefore, we do not weigh the evidence, *State v. Devers*, 260 Md. at 371, 272 A.2d at 800, nor do we, using hindsight, determine whether, had the case gone to trial, a rational trier of fact probably would have convicted the defendant. The relevant inquiry is whether there was any evidence from which the trier of facts could have done so.

## B.

When it initiated the robbery prosecution, and certainly when the case was tried, the State had a tremendous amount of evidence tending to prove that Jamie was dead. Jamie had been missing since April 3, 1982, approximately three months by the time Whittlesey was charged with robbery and, by the time of trial, almost two years. Whittlesey had been seen with Jamie on the day before he disappeared. It was contrary to Jamie's habits and character to fail to keep in touch with his parents; when he was away from home and would not return when expected, it was Jamie's habit to call them.

Whittlesey's first account of his last involvement with Jamie differed significantly from his later accounts, particularly those he related to Strathy. As noted, during those conversations, Whittlesey said Jamie was dead, although he also gave differing accounts as to how he died. Jamie's property was found in Whittlesey's possession, but here again, Whittlesey's account of how that came to be differed

from the State's theory: he told a friend that he won it shooting pool. Furthermore, Strathy reported that he had been asked by Whittlesey to help bury a body in Gunpowder State Park, where he observed under a little mound covered with pine needles, a red shirt and a jacket like those worn by Jamie when last seen alive, and a tennis shoe. Using a shovel, Strathy poked in the area of the shirt and jacket and found it to be "like hard." The police conducted an intensive search for the victim's body, including the area of Gunpowder State Park where Strathy said he had seen what could have been a body. When they accompanied Strathy to the area, however, there was no longer a mound of pine needles. At no time between Jamie's disappearance and the robbery trial had Jamie's parents or relatives been contacted, something that was, again, contrary to Jamie's habits and character.

The State also had evidence as to the manner of Jamie's death. Whittlesey said that Jamie bled to death from a head injury suffered when he ran into a tree. Later, Whittlesey acknowledged that he "might've pushed him." He also said that he had been told that Jamie had a lot of money and he thought he could punch him in the face and grab the money and that after Jamie lay bleeding on the ground and he knew he was dead, he reached into his back pocket for his wallet, and after finding the keys to the car, he took it and left the scene. In still another conversation, Whittlesey told Strathy that, after he had taken Strathy to the area where the body was, he went back and buried the body. He described in detail how he did it, including the facts that he buried the body very deep and disposed of the excess dirt by putting it in a stream. This may explain why there was no mound when Strathy took the police to where he had seen what may have been a body. When asked about the shovel he used, Whittlesey said that he put it in a dumpster, bent out of shape. When asked why he pushed Jamie into the tree when Jamie had no money, Whittlesey told Strathy that he found out Jamie had a $750.00 money

order.  Finally, Whittlesey told Strathy that he "really didn't like the kid, anyhow."

During closing argument at the robbery trial, the prosecutor argued:

Ladies and gentlemen, there are so many circumstances here indicating that what Michael Whittlesey told you, and he did tell you through David Strathy through those tapes, he told you what he did that night and why he did it.  He pushed the kid, reached in his back pocket and took his wallet and car keys and watched him die, watched him die, bleed to death. . . .  There is one person who didn't testify.  We know why he didn't testify because he's not here.  He's buried six feet in the ground. It would be ludicrous to believe that because Jamie Griffin didn't testify that this defendant can't be found guilty. It would be ludicrous to believe that there are not sufficient circumstances here to corroborate everything that the defendant said on those tapes.

I think it significant that the prosecutor's argument was premised on the corroboration of Whittlesey's admission that he pushed Jamie into a tree and then watched him bleed to death.  Clearly, his theory was felony murder. Clearly, he, a reasonable prosecutor, had no doubts concerning either Jamie's death or its cause.

Having weighed the evidence, the jury returned a verdict of guilty of robbery and of theft over $300.00.  The Court of Special Appeals rejected a challenge to the sufficiency of that evidence and affirmed.

The evidence adduced at the robbery trial was likewise sufficient to sustain a conviction for felony murder.  Proof of felony murder does not require that the killing in the course of the felony be intentional. *See Campbell v. State,* 293 Md. 438, 442, 444 A.2d 1034, 1037 (1982); *Frye,* 283 Md. at 713, 393 A.2d at 1374; *Newton,* 280 Md. at 278, 373 A.2d at 267–68; *Warren v. State,* 29 Md.App. 560, 566, 350 A.2d 173, 178 (1976); *Evans v. State,* 28 Md.App. 640, 686, 349 A.2d 300, 329–30 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629

(1976). Consequently, the discovery of Jamie's body added nothing to what was already known except the precise manner of death. That the cause of death was homicide being already inferable, the medical examiner's determination is no more than confirmatory. Accordingly, postponing charging and trying Whittlesey for felony murder until after the body was discovered had the effect only of strengthening the State's case, not providing it with evidence to prove it.

## III.

## A.

While acknowledging that murder may be proven by circumstantial evidence even when the victim's body is not recovered,[11] the majority bemoans the difficulty of doing so:

---

**11.** The rationale behind allowing a prosecution for murder to go forward even though the victim's body has not been recovered is that a murderer should not be rewarded for successfully concealing the victim's body. *Government of Virgin Islands v. Harris,* 938 F.2d 401, 415 (3rd Cir.1991); *Hurley v. State,* 60 Md.App. 539, 550–51, 483 A.2d 1298, 1304 (1984), both citing *People v. Manson,* 71 Cal.App.3rd 1, 42, 139 Cal.Rptr. 275, 298 (2d Dis.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978) and *State v. Zarinsky,* 143 N.J.Super. 35, 362 A.2d 611, 621 (1976), *aff'd,* 75 N.J. 101, 380 A.2d 685 (1977).

In cases where the body is not recovered, "the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which would indicate that it was caused criminally by someone." *Jones v. State,* 188 Md. at 272, 52 A.2d at 488. *See Hurley,* 60 Md.App. at 549, 483 A.2d at 1303 and *Lemons v. State, supra,* both homicide prosecutions, in which the victim's body was not recovered. When direct evidence is not available, the *corpus delicti* may be proven by circumstantial evidence and this is true even when the circumstantial evidence applies to the fact of death. *Hurley,* 60 Md.App. at 550, 483 A.2d at 1304. It is not necessary to show by direct evidence how the victim was killed; circumstantial evidence may be used also to establish the manner of the victim's death. In the absence of direct evidence such as an extrajudicial confession, circumstantial proof of the *corpus delicti* and, in particular, of the defendant's criminal agency, however, must be such as to convince any rational trier of fact beyond a reasonable doubt. *Hurley,* 60 Md.App. at 553, 483 A.2d at 1305, citing *Jackson v.*

*Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

It is not necessary to show by direct evidence that violence was used to kill the victim; as with other facts, circumstantial evidence may be used to establish that fact. *See People v. Bolinski,* 260 Cal.App.2d 705, 67 Cal.Rptr. 347, 354 (1968). Indeed,

> [w]orldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person in view of his health, habits, disposition and personal relationships would voluntarily flee, "go underground," and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

*Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882, 890 (1982). *Hurley* is an example of a case in which circumstantial evidence was found sufficient to sustain a defendant's guilt, hence, to establish a *prima facie* case. There the court found the following evidence to be sufficient:

> (1) the last time the victim was seen alive by her daughter, the latter heard a scream and saw her mother on the floor of appellant's office;
>
> (2) the appellant's own inconsistent statements concerning his wife's disappearance, *i.e.,* his inability to account for his activities for several hours the night she disappeared; his persistent denial of washing his truck despite the testimony of two eyewitnesses to the contrary; his involvement in repossessing her car; and his comments to a secretary that certain rugs were seized as a result of the investigation when none were, in fact, taken by police;
>
> (3) Catherine Hurley's relationship with appellant;
>
> (4) her character and patterns of behavior; and
>
> (5) the lack of activity on Catherine's bank accounts and credit cards and lack of contact with family members, friends and governmental agencies.

60 Md.App. at 553, 483 A.2d at 1305–06. *See also Bolinski,* 67 Cal. Rptr. at 353. *But see Commonwealth v. Kysor,* 334 Pa.Super. 89, 482 A.2d 1095 (1984).

It is rather interesting to note that, in *Hurley,* one of the circumstances the court found significant in its sufficiency of the evidence analysis was Hurley's "own inconsistent statements concerning his wife's disappearance." That factor has been considered by courts to be a basis for prosecution, rather than an impediment to prosecution, as the majority intimates. *E.g. Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155, 158 (1943) ("The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt. If the jury believed that the statements made by the prisoner of the occurrence were false, his falsehood was therefore at least a circumstance affording some presumption against his innocence." Quoting *Cathcart v. Commonwealth,* 37 Pa. 108, 113 (1861)). *See also State v. Pyle,* 216 Kan. 423, 532 P.2d 1309, 1317 (1975); *Warmke v. Commonwealth,* 297 Ky. 649, 180 S.W.2d 872, 873 (1944). In fact, using that factor, courts have found less, or at least no more, evidence

"absent a body and lacking, therefore, an expert opinion as to the manner and cause of death, it would be difficult to establish, by way of circumstantial evidence, the elements called for under the murder indictment, namely, that Jamie was dead, that the manner of his death was felonious homicide, and that Whittlesey had killed him."

(326 Md. at 528, 606 A.2d at 238). That difficulty is exacerbated in this case, we are told, because Whittlesey gave various versions of the victim's disappearance, which "clouded whatever may have been the true facts...." (326 Md. at 528, 606 A.2d at 238). From this premise, the majority concludes that a reasonable prosecutor would not have been satisfied that he or she would have been able to establish Whittlesey's guilt beyond a reasonable doubt. That reasoning is irrelevant to the charge of felony murder and it is wrong.[12]

The test is not whether the prosecution reasonably believed it could secure a conviction for felony murder when the robbery prosecution was brought. It is, rather, whether the State was able to proceed on the felony murder charge at that time.

than in this case to be sufficient to prove the *corpus delicti. See Lettrich, supra; Warmke, supra; Deering v. State,* 273 Ark. 347, 619 S.W.2d 644 (1981).

**12.** It is rather curious that the majority is content in this context to defer to Whittlesey's equivocation as to the fact, or the manner, of the victim's death. That he gave differing accounts and never unequivocally "confessed" is cause for the majority to sanction piecemeal prosecutions and to buttress its conclusion that guilt could not have been proven. As we have seen, *see* n. 11, *supra,* contrary to the majority's position, inconsistent statements by a suspect may be used, and often have been used, *see e.g. Hurley,* 60 Md.App. at 553, 483 A.2d at 1305–06, for the opposite purpose. Furthermore, Whittlesey made admissions during the taped conversations with Strathy: he admitted the victim was dead, he admitted that he was involved in that death, and he admitted burying the body. These admissions were enough to make out a *prima facie* case. As the prosecutor argued with respect to the robbery and related charges, they were sufficient, with corroboration, *see Lemons v. State,* 49 Md.App. at 472, 433 A.2d at 1182, to permit a rational trier of fact to find the elements of the crime of felony murder beyond a reasonable doubt. Corroboration may be supplied by the victim's habits, Whittlesey's inconsistent statements, etc.

There was ample evidence which the State concedes constituted at least probable cause to believe Jamie was dead and that he died during the course of the robbery. That evidence was sufficient to convict Whittlesey of robbery and theft and it made out a *prima facie* case for felony murder as well. The State clearly could have proceeded on the felony murder charge and should now be barred from maintaining a successive prosecution.

*United States v. Ragins,* 840 F.2d 1184 (4th Cir.1988) graphically demonstrates this point. There, the defendant was charged with conspiracy and possession of an identification document with intent to defraud the United States government. Prior to trial on those charges, a co-conspirator, having pled guilty, informed the government that the defendant was involved in other conspiracies. Despite this knowledge, the government proceeded to trial and the defendant was acquitted. The government subsequently obtained a second indictment charging the defendant with a continuing conspiracy, setting out overt acts which were previously alleged in the prior indictment. Reversing the denial of the defendant's motion to dismiss on double jeopardy grounds, the Fourth Circuit rejected the government's "undiscovered crime [the *Diaz* ] exception" to the Double Jeopardy Clause:

> There is no merit to this argument. The government undoubtedly knew of the crime itself—the conspiracy to defraud the INS—at the time it began the first prosecution. It also knew that Ragins had been involved to some degree in that crime. The only fact that was arguably "undiscovered" at the time of the first prosecution was the extent of Ragins' involvement. This is a far cry from the typical undiscovered crime case—*e.g.,* the assault becomes homicide when the victim dies. *See Diaz v. United States,* 223 U.S. 442, 448–449, 32 S.Ct. 250, 251, 56 L.Ed. 500, [501] (1912). The undiscovered crime exception was not intended to permit the government to reprosecute a defendant simply because it has discovered more evidence strengthening its case; indeed, if the exception

were so construed, it would swallow the successive prosecution rule itself."

This is precisely the situation *sub judice*. Like the government in *Ragins*, the State in 1982 knew that the crime of murder had been committed and knew who committed it. From all the evidence, *albeit* circumstantial, the inference was inescapable that Jamie was dead and that Whittlesey had killed him. The only facts that were not known, or discoverable, in 1982 and 1984, were the whereabouts of the body and the exact manner of his death. But neither was necessary in order for the State to bring felony murder charges. Furthermore, the State's reluctance to proceed without additional evidence, the body and its revelations, is not grounds for allowing successive prosecutions. The State's recourse was not to proceed with the robbery prosecution, while refraining from proceeding with the murder prosecution, but either to proceed with all prosecutions arising out of Jamie's disappearance or to refrain from proceeding with *any* of them.

The *Diaz* exception is applicable only in a very narrow set of circumstances: those in which the discovered facts are necessary to the State's establishment of a *prima facie* case that the defendant has committed a crime, which, when the defendant was prosecuted for the lesser included, or greater, offense had not been completed or could not have been discovered despite the exercise of due diligence. Where, as here, there existed ample circumstantial evidence of the defendant's commission of the crime, which was known when the prior prosecution proceeded, the discovery of the victim's body and the manner of his death do not fall within this narrow set of circumstances. The subsequent prosecution sought to be pursued in this case is, therefore, barred by the Double Jeopardy Clause.

### B.

Adoption of the reasonable prosecutor test has two critical results. First, despite its acknowledgment that a prose-

cution for homicide may be successfully maintained even without the victim's body, the reasonable prosecutor test effectively vitiates the vitality of that rule. In addition, another effect of adopting the majority's test is completely to destroy the double jeopardy bar against successive prosecutions. Where a defendant has previously been prosecuted for a lesser, or greater, offense, applying a reasonable prosecutor standard to the determination of whether a successive prosecution should be allowed lacks foundation in case law and logic. Certainly the majority has cited not one case which supports its position and I have found none. Engrafting onto the *Diaz* exception the further requirement that a prosecutor reasonably believe that he or she could obtain a conviction before he or she must initiate a prosecution for murder simply reads the *Diaz* exception too broadly. Under such a reading, no successive prosecution will ever be barred because a reasonable prosecutor will always opt for a perfect case before proceeding. Thus, successive prosecutions will become the rule rather than the exception.

The test has ramifications well beyond this case. It may be used to justify splitting virtually any cause of action. Just two examples of the mischief that could occur suffice to make the point. When a defendant is found with a moderate amount of drugs and an issue is the accused's intent to distribute, a "reasonable prosecutor" may be expected to forego prosecuting the defendant for possession with intent to distribute and proceed only on simple possession, opting to wait, and hope, for additional evidence of intent to distribute. Similarly, where the defendant commits an armed robbery with a gun that is not recovered and the description of the weapon is arguably ambiguous, a "reasonable prosecutor" could be expected to forego prosecuting a charge of use of a handgun in the commission of a felony, in favor of proceeding only on armed robbery, in hopes that further investigation, or even evidence adduced at the armed robbery trial, will bolster the belief that the weapon used was actually a handgun.

The majority relies on *United States v. Lovasco, supra,* to support the proposition that prosecutors need not bring an action simply because they have probable cause, or even sufficient evidence to obtain a conviction. Thus, notwithstanding that the State conceded that it had probable cause to arrest Whittlesey for murder when it indicted him for robbery, the majority maintains that it was under no obligation to proceed with the murder charge at that time.

This is not an initiation of prosecution case; it is a successive prosecution case. At issue is the viability of a successive prosecution in light of a prior prosecution, and conviction, for a lesser included offense. Thus, it is appropriate that we focus not on the initiation of the felony murder prosecution, but on the initiation of the robbery prosecution. Whether the felony murder prosecution is viable depends entirely upon what was known, or knowable, by the State when Whittlesey was convicted of robbery. If that prosecution were properly brought, and there is no issue as to that here, and the conviction unassailable, then the question that must be asked is whether it was known, or discoverable, at that time, that a murder arising out of the robbery had been perpetrated. Stated differently, the State was under no obligation to try Whittlesey for robbery when it chose to do so—it could have brought the prosecution or delayed bringing it, in its discretion, based solely on *its* assessment of the evidence. Once, however, it chose to prosecute the robbery charge, the State could not close its eyes to the effect of that prosecution on a subsequent prosecution for felony murder, when conviction of that charge required proof of the same elements. Whether, for purposes of the *Diaz* exception, the felony murder prosecution should have been brought at the same time as the robbery prosecution depends upon the crime being either known or discoverable at that time.

Reliance on *Lovasco,* therefore, is unavailing; that case is inapposite. In *Lovasco,* the Court was not concerned with successive prosecutions; it was concerned simply with the

timing of an initial prosecution. Here, there has been no delay, in the usual sense, of a prosecution. There is, rather, an attempt to maintain a successive prosecution: a lesser included offense of the greater charge has already been tried and the greater charge, not having been brought at the same time, is sought to be tried now. The issue, therefore, is whether the Double Jeopardy Clause bars this subsequent prosecution. *Lovasco* certainly applies when we are concerned with an initial prosecution. As indicated, we are not. To read *Lovasco* as the majority does is to eliminate entirely the Double Jeopardy Clause's bar against successive prosecutions.

CHASANOW, J., joins in this opinion.